## In re USACAFES, L.P. LITIGATION.

### Civ. A. No. 11146.

Court of Chancery of Delaware,
New Castle County.

Submitted: Dec. 3, 1990.
Decided: June 7, 1991.

---

Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington (Robert M. Roseman and Robert G. Eisler, of Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C., Philadelphia, Pa., of counsel), Bruce E. Gerstein and Scott W. Fisher, of Garwin, Bronzaft, Gerstein & Fisher, New York City; Eugene A. Spector, and John F. Innelli, of Eugene A. Spector & Associates, Philadelphia, Pa., co-lead counsel; Elwood Simon, of Schlussel, Lifton, Simon, Rands, Galvin & Jackier, Southfield, Mich., Jules Brody, of Stull, Stull & Brody, Joseph H. Weiss, New York City, Barbara Podell, of Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Alvin J. Ivers, Harvey S. Kronfeld, Philadelphia, Pa., for plaintiffs.

John H. Small, Elizabeth M. McGeever and Ellisa R. Opstbaum, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington (Jackson & Walker, Dallas, Tex., of counsel), for defendants Cafes One, L.P., Cafes General Partner, Inc., Sam Wyly, Charles J. Wyly, C. Jeffrey Rogers, B.B. Tuley, J.D. Francis and F. Jay Taylor.

Charles F. Richards, Jr. and Daniel A. Dreisbach, of Richards, Layton & Finger, Wilmington (Carey R. Ramos, Robert A. Atkins and Rick Antonoff, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendant Metsa, Inc.

## OPINION

ALLEN, Chancellor.

These consolidated actions arise out of the October 1989 purchase by Metsa Acquisition Corp. of substantially all of the assets of USACafes, L.P., a Delaware limited partnership (the "Partnership") at a cash price of $72.6 million or $10.25 per unit. Plaintiffs are holders of limited partnership units. They bring these cases as class actions on behalf of all limited partnership unitholders except defendants. The relief sought includes, *inter alia*, the imposition of constructive trusts on certain funds received by defendants in connection with the Metsa sale and an award of damages to the class resulting from the sale.

The Partnership was formed in the 1986 reorganization of the business of USACafes, Inc., a Nevada corporation. Also formed as part of that reorganization was USACafes General Partner, Inc. (the "General Partner"), a Delaware corporation that acts as the general partner of the Partnership. Both the Partnership and the General Partner are named as defendants in this action. A second category of defendants is composed of Sam and Charles Wyly, brothers who together own all of the stock of the General Partner, sit on its board, and who also personally, directly or indirectly,

own 47% of the limited partnership units of the Partnership. Sam Wyly chairs the Board of the General Partner.

The third category of defendants are four other individuals who sit on the board of directors of the General Partner. All of these persons are alleged to have received substantial cash payments, loan forgiveness, or other substantial personal benefits in connection with the 1989 Metsa purchase.

The last of the defendants is Metsa, the buyer of the Partnership's assets. Metsa is not alleged to be related in any way to the Wylys or any other defendant except as a buyer in the transaction under review.

*The Theories of the Amended Complaint*

The amended complaint arrays four theories of liability against these defendants. The first and most central theory involves an alleged breach of the duty of loyalty. In essence, it claims that the sale of the Partnership's assets was at a low price, favorable to Metsa, because the directors of the General Partner all received substantial side payments that induced them to authorize the sale of the Partnership assets for less than the price that a fair process would have yielded. Specifically, it is alleged that, in connection with the sale, (1) the Wylys received from Metsa more than $11 million in payments (or promises to pay in the future) which were disguised as consideration for personal covenants not to compete; (2) the General Partner (which the Wylys wholly own) received a $1.5 million payment right in consideration of the release of a claim that plaintiffs assert was non-existent; (3) defendant Rogers, a director of the General Partner and President of the Partnership was forgiven the payment of a $956,169 loan from the Partnership and was given an employment agreement with the Partnership that contemplated a one million dollar cash payment in the event, then imminent, of a "change in control"; (4) defendant Tuley, also a director of the General Partner, was forgiven repayment of a $229,701 loan; and (5) the other directors were given em-

ployment agreements providing for a $60,-000 payment in the event of a change in control. In sum, it is alleged that between $15 and $17 million was or will be paid to the directors and officers of the General Partner by or with the approval of Metsa; those payments are alleged to constitute financial inducements to the directors of the General Partner to refrain from searching for a higher offer to the Partnerships. Plaintiffs add that, even assuming that Metsa was the buyer willing to pay the best price, some part at least of these "side payments" should have gone to the Partnership.

The second theory of liability reflected in the amended complaint asserts that the General Partner was (or the directors of the General Partner were) not sufficiently informed to make a valid business judgment on the sale. This theory focuses upon the absence of shopping of the Partnership's assets, or of any post-agreement market check procedure, and on the alleged weakness of the investment banker's opinion. Thus, this claim is that the defendants were uninformed when they authorized the sale to Metsa.

The third theory of liability is asserted on behalf of a class of limited partnership unitholders who held stock in the predecessor Nevada corporation—USACafes, Inc.—and who were issued partnership units pursuant to the reorganization of the USACafes business into the limited partnership form. It is alleged that those persons were misled by a December 5, 1986, prospectus (the "Prospectus"), disseminated in conjunction with the issuance of the partnership units,[1] into believing, reasonably, that, under the then proposed and later adopted structure, any sale of substantially all of the Partnership assets would require the affirmative vote of a majority of all unitholders. The relief apparently sought on this theory is the judicial recognition of an implied right to vote on the Metsa transaction (which has long since closed) or rescission of it in absence of such a vote.

---

1. The prospectus did not seek a shareholders' vote, but rather informed the shareholders that the reorganization would be approved by shareholder action by consent.

The last theory in the amended complaint is the only one asserted against Metsa, the buyer. It charges that Metsa knowingly participated in the other defendants' alleged breaches of duty in connection with the sale by offering and making (or, in the case of the forgiveness of partnership debt, in agreeing to) personal payments to those controlling the General Partner designed to induce those persons to breach fiduciary duties they owed to the limited partners. Plaintiffs claim that this course of action makes Metsa jointly liable for wrongs done to the class or injuries suffered by class members out of this transaction.

\*    \*    \*

*The Pending Motions*

Presently pending are several motions. First, the Wyly defendants and the other director defendants move under Rule 12(b)(6) to dismiss the breach of fiduciary duty claims in the amended complaint asserting that, while the General Partner admittedly did owe fiduciary duties to the limited partners, they as directors of the General Partner owe no such duties to those persons. The whole remedy of the limited partners for breach of the duties of loyalty and care, it is said, is against the General Partner only and not its directors.

The second motion is also brought by the Wylys and the other director defendants and asserts under Rules 12(b)(2) and (4) that this court lacks personal jurisdiction over them because they were not and cannot, under our statutes and the Constitution, properly be served with process and subjected to this court's *in personam* jurisdiction in this case.

The third motion is directed only to the count of the amended complaint that alleges that the 1986 Prospectus was false or misleading. It is made by the Partnership, the General Partner, and the individual defendants. It asserts that the Prospectus was not misleading and that in no event could these defendants be liable even if it were because at the time the Prospectus was issued the Partnership and General Partner owed no duties to the unitholders (who were then shareholders of a Nevada corporation) and the directors owed duties only under Nevada law, for which they may not in this case be sued in this jurisdiction.

Lastly, Metsa has moved under Rule 12(b)(6) to dismiss the claim made against it of aiding and abetting or knowing participation in an alleged breach of fiduciary duty. It asserts it was an arms-length bargainer seeking its own advantage through lawful means, and that the amended complaint contains no allegations that could support a conclusion of participation by it in any wrong.

## I.

In addressing motions to dismiss for failure to state a claim, it is appropriate to assume the truthfulness of all well-pleaded allegations of the complaint and to give the pleader the benefit of all reasonable inferences that can be drawn from its pleading. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988). Only if the court can say with reasonable certainty that plaintiff could prevail on no state of facts inferable from the pleadings may the court dismiss a complaint at this preliminary stage. *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985); *Harman v. Masoneilan International, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982).

The test on the individual defendants' motion to dismiss for lack of personal jurisdiction is rather different. On such a motion it is the obligation of plaintiff to establish by evidence a *prima facie* case that personal jurisdiction is sound. *See Hart Holding Co., Inc. v. Drexel Burnham Lambert Inc.,* Del.Ch., 593 A.2d 535 (1991). Because motions of this kind may turn on evidentiary questions, trial courts are customarily granted a certain discretion to postpone deciding the matter where necessary to permit development of the record. *Id.*

## II.

I turn first to the director defendants' motion to dismiss for failure to state a claim with respect to the sale of the Part-

nership's assets. The gist of this motion is the assertion that the directors of the General Partner owed the limited partners no duty of loyalty or care. In their view their only duty of loyalty was to the General Partner itself and to *its* shareholders (*i.e.*, the Wyly brothers). Thus, in alleging that the director defendants breached duties of loyalty and care running to them, the directors say the limited partners have asserted a legal nullity.

In my opinion the assertion by the directors that the independent existence of the corporate General Partner is inconsistent with their owing fiduciary duties directly to limited partners is incorrect. Moreover, even were it correct, their position on this motion would have to be rejected in any event because the amended complaint expressly alleges that they personally participated in the alleged breach by the General Partner itself, which admittedly did owe loyalty to the limited partners.

■ The first basis of this holding is the more significant. While I find no corporation law precedents directly addressing the question whether directors of a corporate general partner owe fiduciary duties to the partnership and its limited partners, the answer to it seems to be clearly indicated by general principles and by analogy to trust law. I understand the principle of fiduciary duty, stated most generally, to be that one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner. There are, of course, other aspects—a fiduciary may not waste property even if no self interest is involved and must exercise care even when his heart is pure—but the central aspect of the relationship is, undoubtedly, fidelity in the control of property for the benefit of another.[2] *See generally* Robert Flannigan, *The Fiduciary Obligation*, 9 Oxford J. Legal St. 285 (1989).

The law of trusts represents the earliest and fullest expression of this principle in our law, but courts of equity have extended it appropriately to achieve substantial justice in a wide array of situations. Thus, corporate directors, even though not strictly trustees, were early on regarded as fiduciaries for corporate stockholders. *E.g., Koehler v. Black River Falls Iron Co.*, 67 U.S. (2 Black) 715, 17 L.Ed. 339 (1863); *Wardell v. Union Pac. R.R. Co.*, 103 U.S. 651, 26 L.Ed. 509 (1881). When control over corporate property was recognized to be in the hands of shareholders who controlled the enterprise, the fiduciary obligation was found to extend to such persons as well. *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, Del.Ch., 120 A. 486, 491 (1923).

While the parties cite no case treating the specific question whether directors of a corporate general partner are fiduciaries for the limited partnership, a large number of trust cases do stand for a principle that would extend a fiduciary duty to such persons in certain circumstances. The problem comes up in trust law because modernly corporations may serve as trustees of express trusts. Thus, the question has arisen whether directors of a corporate trustee may personally owe duties of loyalty to *cestui que trusts* of the corporation. A leading authority states the accepted answer:

> The directors and officers of [a corporate trustee] are certainly under a duty to the beneficiaries not to convert to their own use property of the trust administered by the corporation.... Furthermore, the directors and officers are under a duty to the beneficiaries of trusts administered by the corporation not to cause the corporation to misappropriate the property.... The breach of trust need not, however, be a misappropriation.... Any officer [director cases are cited in support here] who knowingly causes the corporation to commit a breach of trust causing loss ... is personally liable to the beneficiary of the trust....

---

**2.** Thus, for example, a borrower of money is not considered a fiduciary for the lender simply because she is bound to return the principle sum plus interest. The "property" is held by the borrower for her own benefit.

Moreover, a director or officer of a trust institution who improperly acquires an interest in the property of a trust administered by the institution is subject to personal liability. He is accountable for any profit.... Even where the trustee [itself] is not liable, however, because it had no knowledge that the director was making the purchase ..., the director ... is liable to the beneficiaries.... The directors and officers are in a fiduciary relation not merely to the [corporation] ... but to the beneficiaries of the trust administered by the [corporation].

4 A. Scott & W. Fratcher, *The Law of Trusts* § 326.3, at 304–306 (4th ed. 1989) (citing cases) ["Scott on Trusts"].

The theory underlying fiduciary duties is consistent with recognition that a director of a corporate general partner bears such a duty towards the limited partnership. That duty, of course, extends only to dealings with the partnership's property or affecting its business, but, so limited, its existence seems apparent in any number of circumstances. Consider, for example, a classic self-dealing transaction: assume that a majority of the board of the corporate general partner formed a new entity and then caused the general partner to sell partnership assets to the new entity at an unfairly small price, injuring the partnership and its limited partners. Can it be imagined that such persons have not breached a duty to the partnership itself? And does it not make perfect sense to say that the gist of the offense is a breach of the equitable duty of loyalty that is placed upon a fiduciary? It appears true that the same result might be rationalized as aider and abettor liability, but I am unsure what such indirection would add that is useful where a self-dealing transaction or other diversion of partnership property is alleged. Indeed in some instances, for example the use by a director of confidential information concerning the partnership's business not yet known by the board of the general partner, there may be no breach of loyalty or care by the general partner itself to abet, yet there may be director liability to the partnership by the director. *Cf.* cases cited at 4 *Scott on Trusts* § 326.3, at n. 7.

Two courts have, in fact, held a sole shareholder/director of a corporate general partner personally liable for breach of fiduciary duty to limited partners, although without much discussion of the issue here considered. *See Tobias v. First City National Bank and Trust Co.*, 709 F.Supp. 1266, 1277–78 (S.D.N.Y.1989); *Remenchik v. Whittington*, Tex.Ct.App., 757 S.W.2d 836 (1988); *see also In re Integrated Resources, Inc.*, Case No. 90–B–10411 (CB) (Bankr.S.D.N.Y. Oct. 22, 1990) (controlling shareholder held liable).

While these authorities extend the fiduciary duty of the general partner to a controlling shareholder, they support as well, the recognition of such duty in directors of the General Partner who, more directly than a controlling shareholder, are in control of the partnership's property. It is not necessary here to attempt to delineate the full scope of that duty. It may well not be so broad as the duty of the director of a corporate trustee.[3] But it surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership. That is what is alleged here.

The amended complaint contains the following allegations:

16. The General Partner and its directors, the named individual defendants, are in a fiduciary relationship with the plaintiffs and the other Unitholders of USACafes....

17. ... Through their unit ownership and executive positions [the director defendants] have dominated and controlled the affairs of USACafes. Among other things, they have ... failed to adequately solicit or consider alternative proposals for USACafes, have failed to negoti-

---

**3.** For example, I imply nothing on such questions as whether a director of a corporate general partner might be held liable directly to the partnership on a "corporate" opportunity theory or for waste of partnership assets (two possible consequences of characterizing such persons as fiduciaries for the partnership).

ate in good faith to enhance Unitholders' values and, instead, have agreed to sell all of its assets to Metsa, which will result in the minority limited partners receiving the grossly inadequate price of $10.25 per Unit. As inducement to the individual defendants to agree to the Metsa proposal, Metsa offered to pay and the individual defendants agreed to accept, certain additional payments (approximately $17 million) that were not offered to the classes....

19. The individual defendants and the General Partner participated in the wrongdoing complained of in order to divert the valuable assets of USACafes for their own benefit by entering into highly favorable compensation arrangements with Metsa as part of the liquidation of USACafes.

■ I therefore conclude that the amended complaint does allege facts which if true establish that the director defendants have breached fiduciary obligations imposed upon them as directors of a Delaware corporation or have participated in a breach of such duties by the General Partner. The amended complaint does, in my opinion, state a claim upon which relief can be granted.

### III.

I pass now to the question whether the director defendants can and have, with respect to the foregoing claim, been lawfully subjected to the jurisdiction of this court. Generally that question entails a determination of the constitutionality of requiring them to defend that claim in this jurisdiction and a determination whether a statute of this state authorizes assertion of such power. For the reasons that follow, I conclude that defendants constitutionally may be and have been properly subjected to the jurisdiction of this court.

A. The Constitutional Basis for Exercising Personal Jurisdiction Over the Individual Defendants

■ It is now firmly established in our law that a part of that liberty to which a person is entitled under the Fourteenth Amendment is a right not to be required to defend a lawsuit in a distant jurisdiction unless by some act one has made it fair to do so.

The individual defendants appear to have only the following connections with this jurisdiction. In 1986 they appear to have authorized the creation of a Delaware corporation and a Delaware limited partnership to serve as a new, more complex form for the business then conducted in the Nevada corporation, USACafes, Inc., and from that time to this they have served as directors of that Delaware corporation and through it controlled and directed the affairs of the Delaware limited partnership. The creation of this structure entailed authorized acts in this state—the various filings necessary to accomplish these steps—and, of course, through it the individual defendants became empowered by Delaware law and necessarily accepted certain duties under that law. While these duties are voluntarily assumed and run to private persons, enforcement of duties of this type is a thing in which this state has a public interest. *See Armstrong v. Pomerance,* Del.Supr., 423 A.2d 174 (1980).

\* \* \*

■ The constitutional standard for determining whether a state may exercise judicial power over a person is fairness and substantial justice. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). These commodious terms orient analysis but obviously cannot themselves determine the conclusion of it. A particularized inquiry is necessary. A central feature of this particularized inquiry into the fairness of asserting judicial power concerns the purposive actions of the would-be defendant and the reasonable expectation of one in his position. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985). Thus, the court asks whether it should have been reasonably anticipated by such a person that his or her actions might result in the forum state asserting personal

jurisdiction over him in order to adjudicate disputes arising from those actions. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 297, 100 S.Ct. at 567. A number of factors may go into this decision. The purposeful acts of defendant are the focus of attention but those acts need not occur within the jurisdiction, so long as they create some substantial relationship with the forum jurisdiction. *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184.

The premier example of a foreseeable relationship with a distant jurisdiction that will render fair the assertion of jurisdiction by its courts is the knowing shipment of a product into the jurisdiction where, due to a defect, it causes injury. *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. at 567. But the protection of the legal rights of an injured resident, while a strong forum interest, is not the only such interest that a person should reasonably expect a distant jurisdiction to respect. It might not be contested, for example, that each state has an interest in seeing to the effective administration of its law to matters that, by reason of its law, are governed by that law. This jurisdiction, for example, has a strong interest in the effective administration of the law governing corporations and limited partnerships organized under its laws. *Armstrong v. Pomerance,* Del. Supr., 423 A.2d 174, 177 (1980); *McDermott Inc. v. Lewis,* Del.Supr., 531 A.2d 206 (1987).

A strong state interest in the subject matter of litigation cannot alone constitutionally justify the assertion of jurisdiction over a person who has not acted in a way that reflects the intentional creation of a relationship with the forum jurisdiction, but such an interest may in some circumstances support the conclusion that a purposeful act by the would-be defendant did create the kind of relationship in which an assertion of judicial power might be thought reasonable and thus foreseeable.

■ There is, of course, a distinction between choice of law questions and questions of personal jurisdiction, and it is the case that a choice of law provision, without more, will not create a sufficient contact to support personal jurisdiction in the state whose law is chosen to govern the relationship. *See Burger King,* 471 U.S. at 481–82, 105 S.Ct. at 2186–87; *Atlantic Financial Federal v. Bruno,* 698 F.Supp. 568 (E.D.Penn.1988). But employing the law of a jurisdiction to create legal entities, as is alleged here, is not a mere choice of governing law. The creation of a legal entity creates a forum state public interest in the governance of that entity. *Armstrong v. Pomerance,* Del.Supr., 423 A.2d 174 (1980). The Supreme Court of the United States has acknowledged that when a person has purposefully acted to create a relationship, even of some minimal kind, with the forum state, then "the forum state's interest in adjudicating the dispute" should be given weight in determining if, in all of the circumstances, exercise of jurisdiction would comport with fundamental notions of fair play and substantial justice. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 292, 100 S.Ct. at 564.

With this much the individual defendants may safely agree. They add, however, that Delaware's interest in adjudicating the consequences of corporate directors' conduct extends only to director conduct *qua* director [4] and that the claim that is sought to be adjudicated here is not such a claim. That is, they argue that their duties as directors are or were owed only to the corporate General Partner and to the Wyly brothers as the shareholders of the General Partner. Since in their view they owed no duty in their capacity as directors to the Partnership or its limited partners, they assert that they are not subject to the jurisdiction of a court in this state on claims arising out of injuries to the limited partners. But, as set forth above, I cannot agree with the premise of this argument—

**4.** Some contacts (such as continuing legal presence) are so substantial that they create a general affiliation with the jurisdiction, justifying suit there even on claims unrelated to acts in or affecting the forum. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984); *Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105 (1988). Service as a director of a Delaware corporation is very obviously not such a contact.

that Delaware law imposes no duty upon directors of a corporate general partner running to the partnership and to the limited partners.

It is true that our earlier cases have supposed or implied that it would be unconstitutional for Delaware to attempt to compel the appearance of directors here to litigate any claims other than claims for breach of their fiduciary duty *to the corporation. Pestolite, Inc. v. Cordura Corp.,* Del.Super., 449 A.2d 263 (1982); *Hana Ranch, Inc. v. Lent,* Del.Ch., 424 A.2d 28 (1980). These cases are treated briefly below. In connection with the constitutionality of subjecting the director defendants to suit on this claim in this jurisdiction, I note that while I concur that the test employed by those cases will yield the correct result constitutionally in the vast run of cases, the facts of this case expose their formulation as somewhat overbroad. The constitutional test of *International Shoe, World-Wide Volkswagen* and other cases in the line, is specific, particular, and practical. It requires a specific judgment concerning fairness considering all of the particular circumstances. *Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185–86. The conceptual approach of *Pestolite,* for example, can be an important guide in that judgment but cannot, in my opinion, be the exclusive test.

In my opinion, a realistic evaluation· of the relationship the individual defendants in this case have established with Delaware requires the conclusion that it is quite in keeping with traditional notions of fair play and substantial justice to require them to defend these claims in this jurisdiction. The Delaware corporation which the individual defendants serve as directors was created for the sole purpose of conducting the affairs of another Delaware entity, the Partnership. The relationship between the General Partner and the limited partners

was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the internal affairs or corporate governance issues that Delaware law is especially concerned with. *Compare Prudential–Bache Securities, Inc. v. Franz Mfg. Co.,* Del.Super., 531 A.2d 953 (1987) (contract); *Pestolite, Inc. v. Cordura Corp.,* Del.Super., 449 A.2d 263 (1982) (contract). The wrongs here are alleged breaches of fiduciary duties of the General Partner and of its directors *qua* directors created by Delaware law and of especial concern to it. I conclude that it would constitute no offence to traditional notions of fairness to require those who have chosen to serve as directors of the General Partner to defend their actions here rather than elsewhere. *See Shaffer v. Heitner,* 433 U.S. 186, 222–24, 97 S.Ct. 2569, 2589–90, 53 L.Ed.2d 683 (1977) (Brennan J., concurring in part and dissenting in part).

**B. The Statutory Basis for Exercising Jurisdiction**

■ Having determined that the court may constitutionally exercise jurisdiction over these corporate directors on claims that they caused injury to the limited partners, it remains to be decided whether the directors' consent statute, 10 *Del.C.* § 3114, permits service of process on them for such claims.[5]

On its face Section 3114 is extremely broad. It provides for service of process on non-resident directors:

in all civil actions or proceedings brought in this State, by or on behalf of, or

---

5. Plaintiffs have also attempted to serve process under subsection c(3) of Delaware's long-arm statute, 10 *Del.C.* § 3104. This subsection permits service of process on parties causing tortious injury in the state by acts or omissions occurring within the state. In my opinion, the acts or omissions of one serving as a director of a corporation cannot be said to occur within this state merely because the corporation is domiciled here. In any case, it is not necessary to address this alleged basis for jurisdiction because I find that service of process was effected properly under the directors' consent statute.

*against such corporation*, in which such director, trustee or member *is* a necessary or *proper party, or* in any action or proceeding against such director, trustee or member for violation of his duty in such capacity, . . . .

10 *Del.C.* § 3114 (emphasis added).

The section contains two bases to assert jurisdiction. First, if the individual is a "necessary or proper party" in an action in which the corporation itself is a real or nominal party, the terms of the statute would seem to have been met. Alternatively, if the action alleges a violation of the director's duties in her capacity as a director, the latter clause of the statute is satisfied.

The first basis for asserting jurisdiction under the statute ("necessary or proper party") would plainly authorize service in some actions in which compulsory service would be in tension with the teachings of *International Shoe.* For example, suppose a controlling shareholder/director causes a Delaware corporation to breach a valid contract with a third party and to enter a substitute contract with him on terms that are somewhat more beneficial to the corporation. Assume no acts with respect to the contract, including its prospective performance, occurred or were to occur in Delaware. Now assume suit by the disappointed third party is brought in Delaware against both the corporation (for breach) and the director (for inducing the breach or for interfering with the contract). In such a suit, the first basis for jurisdiction under Section 3114 would seem plainly to authorize service upon the director, but quite obviously a motion to quash such service would be granted as there would be virtually no relationship among the parties, the litigation, and the forum that would render it fair to require the director to defend the suit here. *Cf. Pestolite*, 449 A.2d at 266–267.

Because the first clause of Section 3114 so plainly is susceptible to unconstitutional application, this court in *Hana Ranch* construed the word "or" to mean "and," in effect reading this clause out of the statute. 424 A.2d at 30; *see also Pestolite*, 449 A.2d at 266; *Steinberg v. Prudential–Bache Securities, Inc.*, Del.Ch., C.A. No. 8173, Jacobs, V.C., 1986 WL 5024 (Apr. 30, 1986). An alternative approach might have been to give the legislature's word its ordinary meaning, but to protect against unconstitutional use of the statute on a case-by-case basis—employing the test of the *International Shoe* line of cases to do so. The doctrine of *stare decisis* however, removes that as a possible course at this date.

In this case, however, I conclude that the second basis for exercising jurisdiction under Section 3114 authorizes service of process. That is, I conclude that the directors of the corporate General Partner did owe duties to the Partnership in the nature of a duty of loyalty and that that duty was owed in the "capacity" of director of the corporation. 10 *Del.C.* § 3114; *see Kidde Industries, Inc. v. Weaver Corp.*, Del.Ch. 593 A.2d 563 (1991) (alleged violation of director's fiduciary duty to creditor upon dissolution of the corporation qualifies for treatment under Section 3114 even though no right of corporation or shareholders was in issue). Thus, I conclude that service of process is duly authorized by Section 3114 with respect to these claims. The director defendants' motion to dismiss for lack of personal jurisdiction will, therefore, be denied.

## IV.

The amended complaint alleges that the shareholders who approved the reorganization of the Nevada corporation USACafes, Inc., into USACafes, L.P., did so in reliance upon a prospectus that was materially false and misleading. Allegedly, the Prospectus falsely represented that the unitholders would have a right to vote on a "liquidation" of the Partnership. It allegedly did not adequately inform them that a sale of all assets was not included within the definition of a liquidation. Count I of the amended complaint states in pertinent part:

The Prospectus disseminated in or about December 1986 was materially false and misleading and lacking in complete candor because it falsely represent-

ed that Unitholders would have the right to vote on a plan of liquidation. In reliance upon said representation, plaintiffs and the Prospectus Class approved the Plan which altered the business structure of USACafes from a public corporation to a public limited partnership. Had the misrepresentations or omitted facts been properly disclosed, defendants would not have been able to successfully complete the corporate restructuring. Plaintiffs and the Prospectus Class have been injured thereby, and are entitled to relief including rescission and rescissionary damages.

Because the Prospectus itself discloses that a shareholder vote was neither necessary nor sought on the reorganization of the Nevada corporation, I will dismiss the state law breach of duty of candor claims made with respect to it. Neither plaintiffs nor any class member could have been injured by the alleged defect as they had neither a right to vote nor a right to dissent and seek appraisal.

In their briefing on the current motions plaintiffs assert that the quoted allegation also supports claims of violation of Sections 11 and 12(2) of the Securities Act of 1933, although that statute is nowhere mentioned in the amended complaint. Recognizing that a pleader is not required in a complaint to identify legal theories, *see Kamen v. Kemper Financial Services, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991); *Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 217 (1979), I pass to consideration of the Securities Act claims.

■■ In that connection, I first conclude that the director defendants are not subject to jurisdiction in Delaware on the federal Securities Act claims. Because the Securities Act claims do not arise under Delaware law or otherwise substantially implicate action in or affecting this state, the relationship among those claims, Delaware, and the defendants is not strong enough to

permit the exercise of jurisdiction here based solely on the directors' status as directors. If those claims arose from the same acts or transactions as claims between the same parties over which the court did have personal and subject matter jurisdiction, a different result might be justified. The federal securities claims, however, are distantly related to the alleged breach of fiduciary duty said to arise from the Metsa sale. The fact that the Prospectus alerted stockholders that the prospective reorganization involved Delaware entities does not involve a sufficient Delaware contact when the claim concerns only disclosure.

■■ With respect to the two Delaware entities, the Partnership and the General Partner, plaintiffs claim in their briefs that the misleading statement in the Prospectus subjects them to absolute liability under Sections 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l* (2).[6] Defendants reply that plaintiffs have failed to plead claims under these sections for three reasons. First, they have not pleaded compliance with Section 13 of the Securities Act of 1933; second, they have not alleged that the partnership units they hold were issued pursuant to the Prospectus; and third, they have not pleaded the existence of a buyer-seller relationship.

Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, sets forth the statute of limitations for actions brought under Sections 11 and 12(2). It provides in pertinent part:

No action shall be maintained to enforce any liability created under section 11 or 12(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence....

15 U.S.C. § 77m.

■■ Defendants argue that this section requires that plaintiffs explicitly plead com-

---

**6.** In their briefs plaintiffs put forth the theory of their case as one of absolute liability under these sections rather than one of fraud, either under the federal securities laws or under the common law. Since the pleading contains no allegation of *scienter,* it cannot be read to support a claim of common law fraud. *Simons v. Cogan,* Del.Supr., 549 A.2d 300, 304 (1988).

pliance with Section 13, that is, that they explicitly include an allegation that the case was brought within one year of discovering that the statement was misleading, and that they explicitly set forth the reasons why the misleading statement was not discovered within one year after it was made. While it is true that, in order to state a claim under Sections 11 or 12(2) of the Securities Act, one must plead facts from which satisfaction of the tests of Section 13 may be inferred, *see, e.g., In re Longhorn Securities Litig.*, 573 F.Supp. 255 (W.D.Okla.1983); *McMerty v. Burtness*, 72 F.R.D. 450 (D.Minn.1976), it is not the case that plaintiffs must explicitly address Section 13 in the complaint. "[P]laintiff [need only] plead sufficient facts to demonstrate that he is not barred from pursuing his claims." *Hill v. Der*, 521 F.Supp. 1370, 1388 (D.Del.1981). The allegations of the amended complaint appear to satisfy the demands of Section 13. The facts alleged, if true, indicate that plaintiffs brought this action within one year of the announcement of the sale of assets to Metsa. Before that time, the facts as alleged suggest that plaintiffs had no reason to suspect the alleged misrepresentations in the Prospectus. *Norman v. Paco Pharmaceutical Services, Inc.*, Del.Ch., C.A. No. 10417, Hartnett, V.C., 1989 WL 110648 (Sept. 22, 1989). Thus, even if the formality one would expect is missing, the facts alleged in the amended complaint do, in my opinion, satisfy the requirements of Section 13.

■ Defendants also assert that plaintiffs' claims under Sections 11 and 12(2) must fail because the amended complaint contains no allegations that the units owned by plaintiffs were obtained *pursuant to the Prospectus*. While the amended complaint technically does not comply with this requirement, it does indicate that plaintiffs obtained their partnership units pursuant to the conversion described in the Prospectus. I am unable to conclude at this time that this is not sufficient for present purposes.

Finally, defendants cite the failure of plaintiffs to allege the existence of a buyer-seller relationship as reason to dismiss the claims under Section 12(2).[7] Whether a buyer-seller relationship exists under the facts of this case is, in some respects, related to the question whether the limited partnership interest was acquired "pursuant to the Prospectus." This, however, is not a matter that the parties have briefed. I will not, therefore, act on it now. If defendants feel so inclined, they may renew their motion to dismiss on this issue so that it can be decided after briefing. Thus, defendants' motion to dismiss Count I will be granted except that the federal claims against the Partnership and the General Partner will not be dismissed at this time.

## V.

■ The amended complaint intends to charge Metsa with knowing participation in the wrongs allegedly perpetrated by the Wyly brothers and the other directors of the General Partner. In challenging the adequacy of this pleading Metsa does not challenge the validity of the generalization that one who knowingly participates in the breach of a fiduciary duty stands liable with the primary wrongdoer for injuries resulting from the breach or the recovery of profit wrongfully captured. *See, e.g., Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050 (1984), *aff'd*, Del.Supr., 575 A.2d 1131 (1990); *Penn Mart Realty Co. v. Becker*, Del.Ch., 298 A.2d 349, 351 (1972). Rather, Metsa asserts that no facts have been pleaded that could conceivably support the invocation of that principle. Reading the amended complaint most favorably to plaintiffs, all that it alleges, Metsa claims, is that Metsa negotiated a price lower than plaintiffs would like to receive and engaged in certain collateral agreements that are reasonable and conventional. I cannot so read the amended complaint.

The amended complaint alleges that:

17. ... As inducement to the individual defendants to agree to the Metsa proposal, Metsa offered to pay and the indi-

---

7. Such a relationship is also required under Section 11. *See In re Penn Central Securities*

*Litig.*, 357 F.Supp. 869 (E.D.Pa.1973), *aff'd*, 494 F.2d 528 (3d Cir.1974).

vidual defendants agreed to accept, certain additional payments (approximately $17 million) that were not offered to the classes.

18. Defendant Metsa became aware no later than August 29, 1989 of the fact that the other defendants were planning the liquidation of the company without a Unitholder vote, contrary to the representations made in the Company's December 5, 1986 Prospectus. Metsa, because it was only interested in acquiring the assets of the Company at the lowest possible price, assented to the other defendants' wrongful acts and agreed to pay to the individual defendants monies that would would [sic] otherwise be available to be paid to the Unitholders in consideration of Metsa's purchase of all the Company's assets. In addition, Metsa knowingly rendered substantial assistance to the overall plan and scheme to disenfranchise the Unitholders without any disclosure and contrary to the representations in the December 1986 Prospectus.

37. In order to induce the General Partner (which controlled the management and operations of USACafes) to agree to the grossly inadequate consideration being offered, the General Partner and its directors were offered significant financial incentives to ignore their fiduciary obligations to USACafes limited partners as set forth below in detail.

41. The individual defendants will reap approximately $15 million in benefits for themselves above and beyond the cash they will receive as a result of the liquidation, at the expense of monies that would otherwise be available to be paid to the USACafes Unitholders. These payments are grossly excessive and unrelated to any *bona fide* consideration.

43. The approximately $12 million in non-competition agreements, given to the Wyly Group is also grossly excessive and is merely a device to divert money to the Wyly Group that rightfully belongs to the Unitholders of the Company and would otherwise be available to the Unitholders in a liquidating distribution.

62. Defendant Metsa because its only interest was in paying as little as possible for USACafes, knowingly rendered substantial assistance to the Wyly Group and the other defendants thereby aiding and abetting the other defendants in their breach of fiduciary duty if [sic] fair price.

74. Defendant Metsa has knowingly rendered substantial assistant to the Wyly Group and the other defendants and thereby has actively aided and abetted the other defendants in their breach of fiduciary duty owed to the public Unitholders.

These alleged activities amount to more than simple arm's-length negotiations involving conventional collateral agreements. Plaintiffs have accused Metsa of either offering financial incentives to the General Partner and to the individual defendants to induce them to ignore fiduciary obligations, or of knowingly going along with a diversion of money from the Partnership to the directors. These allegations are not merely conclusory, but are supported by specific details about the payments made incident to negotiating the terms of the agreement. While the payments, as described, may be wholly legitimate, plaintiffs have included enough detail about their size and nature to support, at least at this preliminary stage, the assertion that they were inducements, knowingly made, to breach a duty or payments agreed to by Metsa that knowingly constituted a wrongful diversion from the Partnership.

\* \* \*

The motions of the individual defendants, the General Partner, and the Partnership to dismiss the claims arising out of the sale of the Partnership's assets is denied. The motions of these same parties to dismiss the breach of duty of candor claims arising out of the allegedly misleading statements in the Prospectus is granted. The motions to dismiss the Securities Act of 1933 claims

based on the Prospectus is granted with respect to the individual defendants and denied with respect to the Partnership and the General Partner, with leave to renew the motions should defendants seek to address the Securities Act questions again. Metsa's motion to dismiss is denied.