# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

EQUITY TRUST COMPANY,           )
                                )
            Plaintiff,          )
                                )
    v.                          )   C.A. No.: N17C-05-252 WCC CCLD
                                )
INTERACTIVE BROKERS LLC,        )
                                )
            Defendant.          )
                                )

Submitted: October 25, 2017
Decided: March 6, 2018

**Defendants' Motion to Dismiss – GRANTED**

**MEMORANDUM OPINION**

Thomas R. Pulsifer, Esquire, Matthew R. Clark, Esquire, Daniel T. Menken, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, 1201 N. Market Street P.O. Box 1347 Wilmington, DE 19899-1347. Attorneys for Plaintiff.

Martin S. Lessner, Esquire, Mary F. Dugan, Esquire, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801. Attorneys for Defendant.

**CARPENTER, J.**

# I. FACTUAL & PROCEDURAL BACKGROUND

On December 31, 2000, Interactive Brokers LLC ("Defendant") entered into a service agreement with Delaware Charter Guarantee & Trust Company ("Delaware Charter") (the "Agreement"). Delaware Charter agreed to provide trust and related services for Defendant's customers' retirement accounts ("Accounts"),[1] in exchange for "payment [of] quarterly fees for all open accounts managed by Delaware Charter as well as fees for all accounts close[d] [during a calendar quarter]."[2] The parties executed Exhibit B of the Agreement, which outlined the Defendant's specific fee obligations ("Fee Schedule").[3] Payment of such fees was required within thirty business days after receiving an invoice from Delaware Charter.[4] The original Fee Schedule was properly amended pursuant to the Agreement's Amendment section[5] in 2012 ("Amended Fee Schedule").[6] The Amended Fee Schedule removed any references to retainer fees and lump quarterly fees,[7] and instead created: Non-Bulk Closing Fee of $20 per account and Bulk Closing Fee of $40.[8] The Bulk closing could become applicable if more than 20% of the account base was terminated in

---

[1] Compl. ¶ 13, Pl.'s Ex. 1, at 1 § 1(a).

[2] Pl.'s Answ. Br. in Opp'n to Def.'s Mot. to Dismiss at 2.

[3] Pl.'s Ex. 1, at 9, Exhibit B-Fee Schedule.

[4] Pl.'s Ex. 1, at 3, § 2(k).

[5] "This Agreement may be amended, modified or assigned only by an instrument in writing signed by both parties." Pl.'s Ex. 1, at 6 §11.

[6] Pl.'s Ex. 1, Fourth Amendment to Service Agreement, Amended Fee Schedule [hereinafter Am. Ex. B] (stating the Amended Fee Schedule is effective December 12, 2012).

[7] Pl.'s Ex. 1, at 9, Exhibit B-Fee Schedule.

[8] *See* Am. Ex. B.

any agreement year.[9]

Section 9 of the Agreement titled, Terms and Conditions of the Agreement, defined the length of the Agreement as an initial one-year non-cancelable term with an expiration date of December 31, 2001.[10] Section 9 also provides for automatic renewal for "additional one-year periods effective January 1st unless either party, upon at least sixty days written notice prior to the renewal date, terminates the Agreement."[11]

The term "terminates" is not defined by the Agreement or in the Amended Fee Schedule and the termination provision set forth in Section 10 of the Agreement appears to be inapplicable to the facts of this case. It states:

> In the event of any material breach of this Agreement by one party, the other party may (reserving cumulatively all other remedies and rights under this Agreement and at law and in equity) terminate this Agreement by giving at least thirty (30) days' written notice to the breaching party, provided, however, that any such termination shall not be effective if the party in breach has cured such breach prior to expiration of said thirty (30) day notice period.
> In the event a party initiates or becomes the subject of any proceeding under any federal or state bankruptcy or insolvency law, makes an assignment for benefit of its creditors, becomes insolvent, or if any substantial part of such party's property becomes subject to levy, seizure, assignment or sale for or by any creditor or governmental agency, then the other party may terminate this Agreement by giving thirty (30) days' written notice of such termination and designating a date upon which such termination shall be effective.[12]

---

[9] *See id.*
[10] Pl.'s Ex. 1 at 6, § 9.
[11] *Id.*
[12] *See id.* at 6, § 10.

2

There is no assertion by either party that there was a material breach of the contract nor did any bankruptcy proceedings occur during the Agreement. Neither Section 9 or 10 of this Agreement cross-reference each other nor do they directly reference the Amended Fee Schedule.

It is undisputed that the parties (including Equity Trust Company) renewed the Agreement for over fifteen years, and throughout that period amended the Agreement on four different occasions.[13] One of these amendments, in addition to the Amended Fee Schedule discussed above, took place in October 2012. The Agreement was amended so that Delaware Charter could assign its rights and obligations under the Agreement to Equity Trust Company ("Plaintiff").[14] Defendant alleges that after the assignment, Plaintiff continuously struggled to meet its contractual obligations.[15] After two years, Defendant decided not to renew the Agreement for 2017, and on October 28, 2016, Defendant notified Plaintiff of its decision not to renew the Agreement via the following correspondence ("Notice"):

> Pursuant to Section 9 of the Service Agreement between Interactive Brokers LLC and Delaware Charter Guarantee & Trust Company (the "Agreement"), of which Equity Trust Company is a successor to Delaware Charter, Interactive Brokers LLC elects not to renew the

---

[13] Compl. ¶15.
[14] Compl. ¶19.
[15] Def.'s Mot. to Dismiss at 4.

3

Agreement on January 1, 2017. December 31, 2016 will be the last day the Agreement is effective.[16]

This Notice is at the center of the current dispute. The parties disagree whether the Notice was a termination of the Agreement or simply the required notice under Section 9 to not renew the Agreement. Plaintiff considered the Defendant's Notice as a termination of the Agreement and since all of the account bases would be terminated by the Notice it meets the criteria for more than 20% of the base being terminated and as such demanded Defendant pay the Non-Bulk Closing Fee and the Bulk Closing Fee (jointly the "Closing Fees") for all of the 46,317 Accounts.

Despite Plaintiff's demands for payment, Defendant refused to pay any Closing Fees, but instead offered to pay Plaintiff the proportionate fee for all accounts that remained open in the first quarter of 2017. Specifically, Defendant offered to pay the Plaintiff $4 for any accounts still open, instead of the $60 per account Closing Fee that the Plaintiff is seeking.[17]

As a result, Plaintiff filed the instant action on May 17, 2017, asserting a claim for breach of contract seeking $2.75 million in termination fees, for the 46,317

---

[16] Pl.'s Ex. 2.

[17] Compl. ¶5 ("$4 per account, or $56 per account less than Equity Trust is entitled to pursuant to the terms of the Agreement."). In the Amended Fee Schedule, the annual service fee is broken up into annual and quarterly fees based on the number of accounts. Defendant had 46, 317 accounts at the time of the dispute, which required it to pay Plaintiff $4 per account each quarter or $16 per account annually. After Defendant sent its Notice to the Plaintiff, Plaintiff sought Closing Fees of $60 per account and Defendant refused. Plaintiff alleges that the Defendant instead offer to pay the quarterly fee of $4 per account. *See* Am. Ex. B.

Accounts "terminated" at the end of the Agreement, pre-judgment and post-judgment interest; and costs and expenses incurred including reasonable attorneys' fees. Plaintiff alleges Defendant breached Section 2(k) of the Agreement by failing to pay Plaintiff the Closing Fees within thirty business days of receiving Plaintiff's quarterly invoice on November 29, 2016.[18] Plaintiff also argues Defendant has deprived Plaintiff of its contractual rights "under Section 2(l) of the Agreement to '(i) authorize and instruct Interactive Brokers . . . to liquidate Account assets in order to pay the fees specified per Exhibit B, and (ii) deduct outstanding fees from the proceeds of such liquidated Account assets . . . .'"[19]

Defendant responded by filing the instant Motion to Dismiss the Complaint on July 26, 2017, pursuant to Superior Court Civil Rule 12(b)(6). The Court now turns to the substance of that Motion.

## II. STANDARD OF REVIEW

In considering the Motion to Dismiss for failure to state a claim filed pursuant to Rule 12(b)(6), the Court must assume the truthfulness of the Complaint's well-pleaded allegations,[20] and afford Plaintiffs "the benefit of all reasonable inferences

---

[18] Compl. ¶ 4.

[19] Def.'s Mot. to Dismiss at 5–6.

[20] *See Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38–39 (Del. 1996). *See also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) (noting that the complaint is to be liberally construed and under "Delaware's judicial system of notice pleading, a plaintiff need not plead evidence" but must "only allege facts that, if true, state a claim upon which relief can be granted").

that can be drawn from [their] pleading."[21] Certain documents that are "integral to a plaintiff's claims...may be incorporated by reference without converting the motion to a summary judgment."[22] At this preliminary stage, dismissal will be granted only when the Court is able to determine with "reasonable certainty" that Plaintiffs would not be entitled to relief "under any set of facts that could be proven to support the claims asserted" in the Complaint.[23]

## III. DISCUSSION

To survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must allege (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damages.[24] In the instant case, the parties do not dispute the sufficiency of Plaintiff's allegations with respect to the elements of an existing contract and, if proven, the damages that would flow from the breach. Instead, the parties disagree as to whether Plaintiff has adequately alleged that Defendant breached the Agreement when it gave notice that it was ending their relationship in 2016 and by failing to pay Closing Fees at the end of their Agreement.

In addressing issues of contract interpretation, the Court aims to determine the parties' shared intent, referring first to "the relevant document, read as a whole, in

---

[21] See In re USACafes, L.P. Litig., 600 A.2d 43, 47 (Del. Ch. 1991) (noting, however, that the Court is not required to blindly accept all allegations or draw all inferences in a plaintiff's favor).
[22] See Furnari v. Wallpang, Inc., 2014 WL 1678419, at *3–4 (Del. Super. Ct. Apr. 16, 2014).
[23] See id. (citing Clinton v. Enter. Rent–A–Car Co., 977 A.2d 892, 895 (Del. 2009)).
[24] See VLIW Tech., LLC, 840 A.2d at 612.

6

order to divine that intent."[25] The Court will interpret contract terms according to their "common or ordinary meaning" and contract provisions as a whole, "giving effect to each and every term…in a manner that does not render any provision 'illusory or meaningless.'"[26] If contractual language "is plain and clear on its face, *i.e.,* it…conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[27] If, however, the terms are ambiguous, extrinsic evidence may be considered to determine the parties' intentions.[28] Ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[29] At the motion to dismiss stage, the Court "cannot choose between two differing reasonable interpretations of ambiguous provisions."[30] In other words,

---

[25] *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *5 (Del. Ch. Dec. 30, 2010) (quoting *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008)). *See also Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (noting that that Court must first look to the entire agreement to see if the parties' intent can be discerned from the express words used therein); *Concord Mall, LLC v. Best Buy Stores, L.P.*, 2004 WL 1588248, at *3 (Del. Super. Ct. July 12, 2004).

[26] *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *6–7 (Del. Ch. Dec. 22, 2010) ("As part of that review, the court interprets the words 'using their common or ordinary meaning, unless the contract clearly shows that the parties' intent was otherwise.'" (quoting *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008)).

[27] *Choupak v. Rivkin*, 2015 WL 1589610, at *18 (Del. Ch. Apr. 6, 2015) (quoting *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[28] *See AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008).

[29] *L&L Broad. LLC v. Triad Broad. Co., LLC*, 2014 WL 1724769, at *3 (Del. Super. Ct. Apr. 8, 2014) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)) (internal quotation marks omitted).

[30] *See VLIW Tech., LLC*, 840 A.2d at 615 (Del. 2003) ("[F]or purposes of deciding a motion to dismiss, their meaning must be construed in the light most favorable to the non-moving party.").

"[d]ismissal is proper only if the defendant['s] interpretation is the *only* reasonable construction as a matter of law."[31] "[W]hen parties present differing—but reasonable— interpretations of a contract term, the Court turns to extrinsic evidence to understand the parties' agreement. Such an inquiry cannot proceed on a motion to dismiss."[32]

Notably, both parties rely on the express language of Section 9 and the Amended Fee Schedule as support for their respective positions. Defendant focuses on the renewal language in Section 9 and argues the right to not renew the Agreement was a valid option, separate and distinct from termination.[33] Specifically, Defendant contends the Agreement created three options for the parties—to allow the Agreement to automatically renew, terminate the Agreement during the one-year term, or not renew the Agreement for another year.[34] Additionally, Defendant argues that even if the right to not renew the Agreement is considered a "termination," Defendant did not terminate any Accounts in the Agreement year of 2016 as it

---

[31] *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

[32] *Renco Grp., Inc. v. MacAndrews AMG Hldgs., LLC*, 2015 WL 394011, at *5 (Del. Ch. Jan. 29, 2015) (citing *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1291 (Del. 2007). *See also Eisenmann Corp. v. Gen. Motors Corp.*, 2000 WL 140781, at *21 (Del. Super. Ct. Jan. 28, 2000) ("This Court, in the context of a Motion to Dismiss, will not foreclose the way for the light that reveals the true intention of the transaction, especially if the instrument does not appear to contain the entire agreement between the parties." (citing *Norfolk S. Bus Corp. v. Virginia Dare Transp. Co.*,159 F.2d 306, 309 (4th Cir. 1947) *cert. denied,* 331 U.S. 827 (1947))).

[33] Def.'s Mot. to Dismiss at 9–10. *See* Pl.'s Ex. 1, at 6, § 9 ("This Agreement shall automatically renew …. unless either party, upon at least sixty (60) days' written notice prior to the renewal date, terminates the Agreement.").

[34] Def.'s Mot. to Dismiss at 9–10.

promised to continue its obligations until midnight of December 31, 2016 (the expiration date).[35] Therefore, it did not trigger Closing fees. Further, Defendant asserts Plaintiff's interpretation of the Agreement produces an absurd result.[36] By reading out any non-renewal option, Defendant "would, in essence, be subject to a penalty for exercising its right not to renew the Agreement, and [Plaintiff] would be entitled to a significant windfall, even if [Plaintiff's] non-performance or breach served as the basis for [Defendant's] decision not to renew."[37]

Plaintiff argues there is no non-renewal option in the Agreement—there is simply a renewal option or termination option.[38] Plaintiff asserts "[t]he Agreement does not contemplate, and [Defendant] did not bargain for, a neutral "non-renewal" option that would allow [Defendant] to terminate the Agreement without incurring the Closing Fees."[39] Plaintiff also argues that Defendant "obtained control of the Accounts post-expiration when they were 'closed' by Equity Trust and 'transferred' to Interactive Brokers"[40] which triggered an obligation to pay the Closing Fees. Plaintiff also rejects Defendant's theory that the Agreement was not terminated during an Agreement year for several reasons. First, Plaintiff asserts the Non-Bulk Closing Fees are not tied to termination during an Agreement year, and the

---

[35] *Id.* at 9.
[36] *Id.* at 10; Def.'s Reply. Br. in Supp. Mot. to Dismiss at 8.
[37] Def.'s Mot. to Dismiss at 11.
[38] Pl.'s Answ. Br. in Opp'n to Def.'s Mot. to Dismiss at 6–7.
[39] *Id.* at 6.
[40] *Id.* at 8.

Defendant must pay them regardless.[41] Second, Plaintiff also argues that termination occurs pursuant to Section 9 as soon as the notice of non-renewal was sent.[42]

Finally, Plaintiff contends that Defendant has failed to demonstrate why Plaintiff's interpretation would lead to an absurd result. Plaintiff argues "[i]t is neither beyond the bounds of reason nor contrary to the purposes of the Agreement for the parties to have agreed that Equity Trust should be entitled to a fee when an account is closed to compensate Equity Trust for its services."[43] Plaintiff urges the Court to find the Closing fees to be "part of the bargained for consideration…for managing the Accounts."[44]

The Court finds the instant Agreement to be unambiguous and it does not require extrinsic evidence to resolve the current dispute. The Court is able to read the Agreement and the Amended Fee Schedule to interpret and reach two reasonable conclusions regarding the Agreement and the Defendant's notice. First, the Court agrees with the Defendant that the Agreement provided the parties a non-renewal option, which Defendant properly exercised. Second, the Court finds the Defendant's non-renewal did not "terminate" the Agreement during a calendar

---

[41] *Id.* at 12.
[42] *Id.*
[43] *Id.* at 9–10.
[44] Pl.'s Answ. Br. in Opp'n to Def.'s Mot. to Dismiss at 11.

quarter in the 2016 Agreement year;[45] that would have triggered the Closing Fees asserted by the Plaintiff.

To reach these conclusions, the Court has focused on the specific language in Section 2(k), Section 9, and the Amended Fee Schedule. It has interpreted the Agreement provisions according to their "common or ordinary meaning"[46] and has "adopt[ed] the construction that is reasonable and that harmonizes the affected contract provisions."[47]

The Court began with Section 9, finding that the provision itself is clear despite the use of both terms "renew" and "terminate." Plaintiff asserts that the use of the term "terminate" instead of not renew is intentional and requires a finding in its favor. However, the Court disagrees and finds this to be a "distinction without a difference."[48] The Agreement fails to define the terms or make an important distinction between them, and if anything, the use of both terms in the Agreement suggests that the terms were used interchangeably to convey the Agreement has ended.[49] The fact that there is separate termination provision in the event of certain

---

[45] Section 2(k) of the Agreement requires payment of Closing Fees for Accounts "closed during a calendar quarter." Pl.'s Ex. 1, at 3, § 2(k). Similarly, Exhibit B requires payment of both Non-Bulk and Bulk Closing Fees if more than 20% of Accounts are terminated in any Agreement Year. *See* Am. Ex. B.

[46] *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *6–7 (Del. Ch. Dec. 22, 2010).

[47] *Axis Reins. Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010).

[48] *Liberty Mutual Insurance Company v. Silva-Garcia*, 2013 WL 4507847, at *6 (Del. Super. Ct. Aug. 22, 2013).

[49] *See* Def.'s Reply. Br. in Supp. Mot. to Dismiss at 5.

breaches, which did not occur here, also suggests the term "terminate" as used in Section 9 was simply intended to reflect that the Agreement was not being renewed.

The Court also finds the Plaintiff's argument that there is no non-renewal option to be unpersuasive. The Plaintiff, in this case, asserts the Defendant did not bargain for a non-renewal option, and to read in a third option directly conflicts with the language of the Agreement because of the use of the term "terminate."[50] As discussed above, the use of "terminate" instead of "non-renewal" is effectively meaningless in the manner this Agreement is structured. The Court finds there is a common sense implication that if you have the option to renew, you also have the option not to renew. Further, there is no language to suggest that non-renewal is not an option. Section 9 provides the terms and conditions of the Agreement which introduces an inherent option for non-renewal. If not renewing the Agreement was intended to be a termination, common sense would suggest the sophisticated parties represented by counsel would have clearly set forth that understanding and referenced the applicable fees. This is not an insignificant amount the Plaintiffs are claiming and to find a fee obligation through the contoured manner they suggest is simply unpersuasive.

After reviewing Section 9 and finding the Defendant exercised its contractual third option of non-renewal, the Court then turned to Section 2(k) and the Amended

---

[50] Pl.'s Answ. Br. in Opp'n Def.'s Mot. to Dismiss at 7.

12

Fee Schedule. Section 2(k) states the Defendant must "[p]ay all Delaware Charter fees for Accounts closed during a calendar quarter... as set forth in Exhibit B to this Agreement...."[51] The clear meaning of calendar quarter to the Court is: 1st Quarter: January 1 through March 31; 2nd Quarter: April 1 through June 30; 3rd Quarter: July 1 through September 30; 4th Quarter: October 1 through December 31.[52] The Defendant sent notice that its obligations under the Agreement would continue through the end of the fourth quarter on December 31, 2016, and other than the assertions in this Complaint, there is no allegation that Defendant did not meet its contractual fee responsibility. Similarly, the Amended Fee Schedule in Exhibit B states that "[i]f more than 20% of the Account base terminates in any Agreement year the Non-Bulk Closing Fee and Bulk Closing Fee are applicable. . . ."[53] Agreement year was previously defined in the original Fee Schedule and in Section 9 to mean January 1 to December 31.[54] Defendant's notice, as discussed above, acknowledged its continuing obligations in the Agreement through December 31, 2016, thus the Court finds there were no Closing Fees owed by Defendant when they did not renew the contract. Plaintiff's argument that termination occurred on the date the notice was sent is illogical and unsupported as the Defendant specifically

---

[51] Pl.'s Ex. 1, at 3, § 2(k).
[52] *Blaschock v. W.C.A.B.*, 625 A. 2d 194, 197 (Pa. Commw. Ct. 1993).
[53] *See* Amended Fee Schedule.
[54] Pl.'s Ex. 1, at 6, § 9; *see also* Pl.'s Ex. 1, at 9, Exhibit B-Fee Schedule.

stated the end date would be December 31, 2016.[55]

The Plaintiff has asked the Court to find that the Defendant did not bargain for a non-renewal option, but at the same time urges the Court to accept a strained interpretation of the Agreement where the Defendant must pay Closing Fees regardless of how the relationship ended.[56] There is no evidence that such a payment was bargained for by the Plaintiff and if they wanted guaranteed Closing Fees, it could have easily contracted for them. The parties amended this Agreement four times over the span of fifteen years. These are sophisticated business parties represented by counsel and to suggest a non-renewal penalty was one bargained for but not clearly set forth in the Agreement is simply unsupported. Considering this, the Court is not willing to find that even if the parties end their relationship amicably the Defendant would have agreed to pay a fee for simply parting ways. The Agreement simply fails to convey that the Amended Fee Schedule, and Sections 2(k) and 2(l) of the Agreement were triggered if Defendant decided to not renew the Agreement after the expiration date of December 31, 2016.

---

[55] *See* Pl.'s Ex. 2.

[56] Mot. to Dismiss Tr. 38–39, Oct. 25, 2017 ("…the parties agreed that they must give notice within 60 days of the end of the year. And if they gave notice in that 60 days, because Section 9 uses the word "terminate," now, therefore, they have terminated in the contract year. And since all the accounts were closed at that point in time, [][Plaintiff] owe us the fees.").

The Court finds the Defendant's interpretation is the only reasonable construction of the Agreement. Therefore, Defendant's Motion to Dismiss with respect to Plaintiffs' breach of contract claim is hereby **GRANTED**.[57]

IT IS SO ORDERED.

/s/ William C. Carpenter, Jr.
Judge William C. Carpenter, Jr.

---

[57] As a final note, in spite of the Court's decision to grant the Motion to Dismiss, it takes note of the excellent arguments made here by all counsel, and in particular the presentation by Mr. Clark. The Court was skeptical about the Plaintiff's position as it entered the argument and Mr. Clark turned what was initially a slam dunk for the Defendant into a closer game. However, in the end, excellent lawyering could not overcome the conclusions reached in this Opinion.