# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LARGO LEGACY GROUP, LLC,   )
  )
    Plaintiff,   )
  )
  )
    v.   )   C.A. No. 2020-0105-MTZ
  )
EVENS CHARLES and CD FD   )
VENTURES LLC, a Delaware   )
limited liability company,   )
  )
    Defendants,   )
  )
and   )
  )
LARGO HOTEL, LLC,   )
a Delaware limited liability company,   )
  )
    Nominal Defendant.   )

## MEMORANDUM OPINION

Date Submitted: March 11, 2021
Date Decided: June 30, 2021

Steven T. Margolin, Lisa Zwally Brown, and Samuel L. Moultrie, GREENBERG TRAURIG, LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

Jason Jowers, BAYARD, P.A., Wilmington, Delaware, *Attorney for Defendants.*

**ZURN, Vice Chancellor.**

The plaintiff in this matter is an investor in a hotel development company, the principals of which launched a parallel venture on an adjacent parcel. The company's principals established the parallel venture in a newly formed entity they owned and controlled. The parallel venture's land and initial funds came from the company in which the plaintiff had invested. According to the plaintiff, the principals transferred the land on the false assumption that it was valueless, failed to reimburse the transferor company for its expenses, and engaged in some sleight of hand in the company's bookkeeping to siphon additional funds from the company for the new venture. The plaintiff brings four claims, primarily contending that the company's principals engaged in a fraudulent scheme that advantaged the new venture and themselves to the plaintiff's detriment. The defendants moved to dismiss. This opinion concludes the plaintiff's broad theory successfully states a claim for the principals' breaches of fiduciary duty and the company's operating agreement, but not fraud. The motion is granted and denied in part.

I.     **BACKGROUND**[1]

Nominal Defendant Largo Hotel, LLC (the "Company") is a closely held Delaware limited liability company. Under its Operating Agreement dated

---

[1] The complaint "ordinarily defines the universe of facts from which the trial court may draw in ruling on a motion to dismiss." *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001). Accordingly, I draw the following facts from the Verified Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached to and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch.

1

October 22, 2014 (the "Operating Agreement"), the Company is manager-managed by manager Defendant CD FD Ventures, LLC ("Manager").[2] Manager directs the Company's operations,[3] and is obligated to provide Members with certain Company

Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Such documents include certain of Defendants' exhibits in support of their motion to dismiss, available at D.I. 16 [hereinafter "Defs.' Ex. —"]. Defendants' Exhibits A, B, D, F, and G are cited or explicitly referenced in the Complaint and therefore incorporated by reference into it. I consider those documents "to ensure that the plaintiff has not misrepresented [their] contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

I do not consider Defendants' Exhibits C, E, H, or I, which are not integral to or incorporated by reference into the Complaint. Rather, those exhibits insert "[m]atters extrinsic to a complaint," which "generally may not be considered in a ruling on a motion to dismiss" even if the moving party claims the evidence contradicts allegations in a complaint. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

Nor do I consider Defendants' contentions that the Complaint's allegations are false in an effort to "correct" the narrative at the motion to dismiss stage. *See* D.I. 16 at 12, 13, 28. The Court may not consider a defendant's denials of disputed facts at the pleading stage. *See Leased Access Pres. Ass'n v. Thomas*, 2020 WL 108563, at *1 n.2 (Del. Ch. Jan. 8, 2020) (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 & 538 (Del. 2011) (explaining that when ruling on a motion to dismiss, the Court must "accept all well pleaded factual allegations as true" and that "[a]t the motion to dismiss stage . . . it matters not which party's assertions are actually true.")).

[2] *See* Defs.' Ex. A §§ 3.1, 5.5(a) & Sched. A [hereinafter "Op. Agr."].

[3] *See id.* § 5.5(a) ("Subject to the provisions of this Agreement, the Manager shall have the exclusive right to control the business of the Company and the Members shall not have any right to take part in the management or control of the business of the Company or to transact any business in the name of the Company.").

financial information.[4]  Manager also provides asset management services for the Company pursuant to an October 22, 2014, Asset Management Agreement.[5]

Manager is owned and controlled by its managing member, Defendant Evens Charles.  Charles is not a signatory to the Operating Agreement in his individual capacity, but at all relevant times, Manager acted through Charles.  Charles also owns and controls nonparty Frontier Largo LLC ("Frontier"), which holds a 35% membership interest in the Company.  Plaintiff Largo Legacy Group LLC ("Plaintiff") has, at all relevant times, held a 15% membership interest in the Company; Plaintiff is managed by nonparty Tracy Prigmore.  The remaining 50% of the Company's membership interests are held by nonparty Largo Galilee LLC ("Galilee," and together with Frontier, the "Majority Members"), which is owned and controlled by nonparty Maiser Aboneaaji.  I refer to Plaintiff, Frontier, and Galilee as "Members."[6]

Section 5.6 of the Operating Agreement saddles Manager with "a fiduciary responsibility to the [Company's] Members."[7]  Section 5.2 vests the Members with a consent right over certain "Major Decisions," which require the consent of 70% of

---

[4] *See id.* § 10.4.

[5] *See id.* Sched. C.

[6] *See id.* § 3.2 & Sched. A.

[7] *Id.* § 5.6.

3

the Company's Membership Interests.[8]  Such Major Decisions include, *inter alia*, capital calls; selling or conveying any interest in the Company's property; and approving "transactions with Affiliates of the Manager, except as provided in Section 5.4."[9]  The Members also agreed under Section 5.4(a) that the Manager or its Affiliates could receive a "salary or other direct or indirect compensation for any services or goods provided in connection with the Company," subject to the consent of 70% of the Company's Membership Interests "to the precise terms thereof."[10] Section 5.4(b) permits "any Member" to "engage independently or with others in other business ventures of every nature and description including the ownership, operation, management, syndication and development of competing real estate, and neither the Company nor any other Member shall have any rights in and to such independent ventures or the income or profits derived therefrom."[11]

### A. The Company Developed And Operates A DoubleTree Hotel On Its Property; Charles Proposes Developing The Adjacent Land Into A Homewood Suites.

The Company is a special purpose vehicle that owns a real estate parcel located at 9100 Basil Court, Largo, Maryland (the "Property"), together with the

---

[8] *See id.* § 5.2; *see also id.* § 3.5 (allowing Members to act by written consent).

[9] *Id.* § 5.2(2), (16), (27).

[10] *Id.* § 5.4(a).

[11] *Id.* § 5.4(b).

184-room DoubleTree Hotel located thereon (the "DoubleTree").[12] The Company also owned the adjacent 3.47-acre, vacant parcel located at 9104 Basil Court (the "Adjacent Land"). The Company acquired the Property and the Adjacent Land at the same time. At the time of purchase, the Adjacent Land was appraised for approximately $900,000.[13]

In the transaction giving rise to this litigation, Charles and the Majority Members transferred the Adjacent Land to a new entity they owned and controlled for development into another hotel. In January 2016, the Company's Members began discussing the Adjacent Land's subdivision and development. On January 18, Charles proposed subdividing it to develop a 115-room Homewood Suites hotel (the "Project").[14] Once the Project was developed, Charles would manage the Homewood Suites and receive an asset management fee in perpetuity in the amount of 2% of the hotel's gross revenue.

According to Charles, Project synergies like cross-selling and shared resources would add value to the Company.[15] Charles proposed spending Company

---

[12] See id. § 2.3 ("The purpose of the Company is to acquire, own, improve, lease, manage, sell and/or otherwise dispose of, hypothecate and/or otherwise deal with the Property and all activities necessary, useful or convenient to carry out the foregoing.").

[13] Although the parcels were purchased together, the Adjacent Land was separately assessed for real property tax purposes.

[14] See Defs.' Ex. B at 2.

[15] See id.

funds on the Project's predevelopment.[16]  While Company funds would get the Project underway, Charles planned to sell the Project to a new entity with the same ownership structure as the Company, and to market the new venture to the Company's Members and other potential investors.[17]  The Company's Members would have the opportunity to invest additional funds to obtain a membership interest in the new entity.[18]  Charles asked Members to "re-invest in accordance with [the Member's] ownership interest in the Company."[19]

The Adjacent Land would be the Company's and current Members' baseline investment in the Project.[20]  Members that did not invest would retain their interest in the Adjacent Land that housed the Project.[21]  The value of that interest would not

---

[16] *See id.*

[17] *See id.*; Defs.' Ex. F at 2; *see also* Compl. ¶¶ 13–16, 20, 22.

[18] *See* Defs.' Ex. B at 2; Comp. ¶¶ 21, 22.

[19] Compl. ¶ 10.

[20] *See* Defs.' Ex. B at 2 ("Largo Hotel LLC owns the land which we valued at around $800K when we purchased but a final evaluation will come later and this will be our equity in the new hotel.  I anticipate about a $15MM project therefore we are going in somewhere between 5-6% collective ownership with the land and I anticipate a total equity check between $4.5-$5M minus our land value."); *see also* Compl. ¶¶ 13–16, 20, 22.

[21] *See* Compl. ¶¶ 10, 17.  By Plaintiff's allegations, it is unclear whether this interest in the Adjacent Land corresponded to equity in the Project.  But Defendants' Exhibit B indicates that Charles's proposed plan contemplated Plaintiff retaining its interest in the Adjacent Land, rather than retaining an independent interest in the Project.  *See* Defs.' Ex. B at 2 ("Just a very rough estimate, your portion to retain your same ownership stake will be somewhere in the $600K range.  I ask you this now to see if you are interested in a similar stake in this project? . . . If you do not want to participate, then you will still own your portion of the land value and I will replace your equity but so far I anticipate the group staying in tack [*sic*].").

be determined by the Adjacent Land's appraised value at the time the Company purchased it; rather, it would be based on the parcel's "final evaluation" that "w[ould] come later."[22]

Under this framework, if Plaintiff did not invest in the Project, it would retain its 2 to 3% interest in the Adjacent Land.[23]  If Plaintiff did invest, Plaintiff would need to pay approximately $600,000 to retain a 15% interest in the Project, duplicating its stake in the Company.[24]  Plaintiff expressed interest in the proposal and requested more information, including financial projections and a site plan, to assess the Project's prospects before making a firm commitment.

### B.    Charles Starts The Project And Offers To Buy Out Plaintiff's Interest In The Adjacent Land.

With Charles at the helm, the Project progressed through 2016.  At that time, the Company still owned the Adjacent Land that would house the Project.  Charles expended Company funds for the Project's predevelopment and other expenses, as contemplated in his January 18 proposal.  Plaintiff was periodically informed that funds were available for Project expenditures, but was not told the source of the funds or how they were spent.  And because Charles was directing the Project,

---

[22] *See* Defs.' Ex. B at 2.

[23] *See* Compl. ¶¶ 10, 16, 17.

[24] *Id.* ¶ 10.

Plaintiff did not have authority or approval over how or whether the funds would be allocated.

Charles asked Plaintiff to assist with the Project by creating an offering memorandum to recruit more investors. Plaintiff considered Charles's request. On May 16, after months of discussions with Plaintiff, Charles provided his proposed financial model for the Project. It contained few concrete details, but did include a value assigned to the land; an acquisition plan for the land and the Project through the new entity; and a developer fee for Frontier Development & Hospitality Group, LLC ("Frontier Development"), which Charles owns and controls.

In the following months, Charles and Plaintiff reached an impasse, and Plaintiff began expressing doubts about investing in the Project. As a result, on August 5, Charles offered to buy out Plaintiff's interest in the still-undeveloped Adjacent Land for $100,000. The offer was not based on the Adjacent Land's valuation or other objective metrics, and Charles did not provide Plaintiff a way to assess the offer's fairness. Charles explained,

> The land is still not subdivided, entitled or capitalized therefore I'm risking the project never materializing by paying you now. As a result, I do not want to base this offer off of the previous appraised value. Otherwise, maintaining your ownership in the land will only be around 2-3% of the [Project].[25]

---

[25] *Id.* ¶ 16.

Therefore, Plaintiff had three options: (1) accept the buyout offer without any indication of whether it was fair; (2) invest an additional $600,000 in the Project; or (3) do neither and simply hold its interest in the Adjacent Land.

Plaintiff asked Charles for more information to assess the buyout offer, specifically the valuation metrics for the Adjacent Land and the corresponding $100,000 offer price, and the timing of any proposed transaction. Charles did not respond. Plaintiff declined the buyout and declined to invest.

At some point, Charles represented to Plaintiff that the Adjacent Land had no value, such that the Members would receive no value for their interest in it, and so the Company would only be reimbursed for the Project's predevelopment costs.[26]

### C. Charles Subdivides And Conveys The Adjacent Land.

On January 20, 2017, Charles emailed Plaintiff stating, "[w]e will be transferring the excess land (we recently subdivided) to a new entity soon for the Homewood Suites development within the next month and each of you will obtain an email as it relates to your interest."[27] Manager and the 85% Majority Members caused the Company to subdivide the Adjacent Land (the "Subdivision") in

---

[26] Plaintiff does not specifically allege that Charles made these representations, let alone identify the specific time and place at which Charles made them. Rather, the Complaint's allegations require the inference that Charles represented these facts to Plaintiff sometime before the January 24 conference. *See* Compl. ¶¶ 23–24; *see also* D.I. 21 at 8–9.

[27] Defs.' Ex. D.

preparation to transfer it to the new entity. The Majority Members, together with new investors, formed that entity as 9103 Basil Court Partners LLC ("9103 LLC"), invested in it, and held membership interests in it. Manager and the Majority Members then conveyed the subdivided Adjacent Land to 9103 LLC for $700,000 (the "Conveyance").[28]

Plaintiff alleges the Subdivision and Conveyance were done at Charles's direction and without Plaintiff's consent. Plaintiff did not know the value assigned to the Adjacent Land in the Subdivision and Conveyance.

On January 24, at a hotel investment conference, Plaintiff confronted Charles about the Subdivision, the Conveyance, the Adjacent Land's value, and the Company's reimbursement for Project costs. Plaintiff also pushed for more information about Charles's earlier buyout offer. Charles told Plaintiff, without elaboration, that the Project would not be financially feasible if any value was placed on the Adjacent Land. Charles also stated that as of that date, the Company had spent approximately $700,000 in predevelopment costs in connection with the Project; that the Company would be reimbursed for those predevelopment costs; and that further details were forthcoming. The $700,000 the Company spent in

---

[28] Tax records indicate that the assigned value for the Conveyance of the Adjacent Land was approximately $700,000. Compl. ¶ 30 n.4.

predevelopment costs was equal to the $700,000 9103 LLC paid the Company for the Adjacent Land.

Charles did not tell Plaintiff that 85% of the Company's Members authorized the Conveyance until March 23, 2018. Charles refused to disclose further details about the Conveyance.

### D. Charles Offers To Reimburse Plaintiff's Contributions To The Project; Plaintiff Scrutinizes The Adjacent Land's Value.

On March 12, 2017, after several more inquiries from Plaintiff, Charles sent Plaintiff a document titled "Payoff Letter and Sources and Uses for Homewood Suite Project" (the "Payoff Letter").[29] The Payoff Letter offered Plaintiff $105,000, calculated as 15% of the Company's $700,000 investment in 9103 LLC, which in turn constituted the Adjacent Land (valued at $0) plus $700,000 in predevelopment costs.[30] This offer deprived Plaintiff of its interest in the Adjacent Land, as well as any profits from the Project's development or reimbursement of additional development costs.

Charles maintained that for the Project to be financially feasible, the Adjacent Land had to carry no value because the Project's predevelopment costs went over budget. Plaintiff alleges those costs were inflated due to Charles's self-dealing:

---

[29] *See* Defs.' Ex. F.

[30] *See id.*

Charles planned to pay Frontier Development, an entity he owns, an $800,000 developer fee. Further, Charles's valuation did not account for the Adjacent Land's standalone value as a vacant parcel.

After receiving the Payoff Letter, Plaintiff asked for more information, including support for Charles's determination that the Adjacent Land had no value, and information underlying the flow of money among the Company, its Members, and 9103 LLC. Charles did not fulfill Plaintiff's requests.

On April 6, Plaintiff confronted Charles about his claim that the Adjacent Land was worth nothing. Plaintiff was concerned Charles had conveyed the Adjacent Land to 9103 LLC for no consideration, and repaid only the predevelopment costs. Charles remained steadfast that the "deal would not work if he assigned a land value."[31]

### E. Plaintiff Discovers That Charles Misused Company Funds To Pay For The Project.

On July 24, Plaintiff received an email from Charles purportedly providing "official notice" of a capital call to the Company's Members to pay a general contractor, affiliated with Majority Member Galilee, in connection with a 2015 DoubleTree renovation project that was closed out before the final payment was

---

[31] Compl. ¶ 33.

made.[32] Charles provided each of the contractor payment applications; a summary of each payment made for the renovation and the discovery of the missing payment; and the Member resolution authorizing the capital call, signed by Frontier and Galilee.[33]

Plaintiff asked for more information about the capital call, as the funds for that renovation project were escrowed before it broke ground, and the project stayed within budget. Based on the information received, Plaintiff concluded the Company had deposited the funds to pay for the 2015 renovation in the Company's membership accounts, rather than using them to pay the contractor. As a result, the Company had excess cash on hand. Plaintiff alleges upon information and belief that Charles used that excess cash to fund the Project's predevelopment, to benefit 9103 LLC and Charles, rather than the 2015 renovation. Then, Charles caused the Company to make a capital call to cover its deficit and pay the 2015 contractor. These actions were taken without Plaintiff's knowledge or approval.

Given Plaintiff's growing distrust of Charles, Plaintiff asked to be diluted rather than make a capital contribution. That request was denied. On September 8, Plaintiff received notice that Frontier, through Charles, elected to make a deficiency

---

[32] *Id.* ¶ 36; *see* Defs.' Ex. G at 1.

[33] *See* Defs.' Ex. G.

loan for Plaintiff's portion in the amount of $67,480. Plaintiff has since paid off the loan plus interest through withheld Membership distributions.

**F.    Charles Again Offers To Buy Out Plaintiff And Stonewalls Plaintiff's Request For More Information.**

In May 2018, Prigmore, on Plaintiff's behalf, informally met with Charles at a trade reception. Charles offered to buy out Plaintiff's interest in the Company for the same amount of its initial investment, $750,000. Prigmore asked about Plaintiff's $105,000 share of reimbursed Project predevelopment costs, and the Conveyance of the Adjacent Land to 9103 LLC. At that point, the discussions became contentious and ended.

In July 2018, Plaintiff asked for more information about the Subdivision and Conveyance, including documentation evidencing the value of the Adjacent Land. Plaintiff also asked for monthly Company financial information as required by the Operating Agreement, which had abruptly stopped. Charles responded that he was withdrawing his buyout offer and that the Company would be producing financial information on a quarterly basis, notwithstanding the Operating Agreement's terms.

To date, Plaintiff has not received any consideration in connection with the Conveyance of the Adjacent Land. Plaintiff has also not received its portion of the reimbursement owed to the Company in connection with the predevelopment of the

14

Adjacent Land. [34]   Plaintiff contends that Charles engaged in a self-dealing, fraudulent scheme in which he conveyed the subdivided Adjacent Land to 9103 LLC—an entity he controls—for no consideration.  Charles's scheme was facilitated by the Company's failure to provide monthly financial information to its Members, through Manager and Charles, despite Plaintiff's repeated requests for such information.

## G.     Plaintiff Seeks Further Information And Files Suit.

Given the dearth of information provided pursuant to the Operating Agreement or in response to Plaintiff's direct requests, Plaintiff made a books and records demand on the Company pursuant to 6 *Del. C.* § 18-305.  The Company denied Plaintiff's demand.  Plaintiff then filed a books and records action in this Court on October 10, 2019 (the "Books and Records Action").[35]  The Company filed its Answer in the Books and Records Action on December 5, and provided some, but not all, of the information Plaintiff demanded.[36]

---

[34] On March 7, 2018, Charles provided Plaintiff with its 2017 K-1 which was incorrect because it reported a distribution valued at $105,000 of non-cash proceeds.  Plaintiff immediately consulted an accounting professional, who requested a copy of the 1065 Partnership tax return to determine the validity of the reporting.  When Plaintiff requested the tax return, Charles provided only an amortization worksheet.  Compl. ¶ 35 n.5.

[35] *See Largo Legacy Gp., LLC v. Largo Hotel, LLC*, C.A. No. 2019-0869-MTZ.  I refer to entries on the docket in the Books and Records Action as "BR D.I. —."

[36] Compl. ¶ 47; *see* BR D.I. 9.

On February 18, 2020, while the Books and Records Action was pending, Plaintiff filed the Verified Complaint in this action (the "Complaint").[37] Count I asserts Manager and Charles breached their fiduciary duties, alleging:

> Manager, by and through the actions of Charles, and Charles, have breached those duties by, among other things, causing the Company to: (i) expend funds in connection with the pre-development of the Adjacent [Land] without reimbursement; (ii) subdivide and convey the Adjacent [Land] to an entity owned and controlled by the Majority Members for no consideration; (iii) fail to adhere to its contractual obligations to distribute monthly financial information in accordance with the Operating Agreement; (iv) allow Charles to perpetuate his fraudulent scheme to use Company funds in connection with the pre-development of the Adjacent Land and then convey such land to the Majority Members for no consideration; (v) fraudulently deposit funds into the Company's membership accounts to then later be used in connection with the pre-development of the Adjacent [Land], creating the need for a capital call; and (vi) make a capital call as part of Charles'[s] fraudulent scheme to recoup funds that were used in connection with the pre-development of the Adjacent [Land].[38]

Count III asserts a claim against Charles, in the alternative, for aiding and abetting Manager's breaches of fiduciary duty. Count II asserts Manager and Charles defrauded Plaintiff by (1) concealing facts and information material to the Subdivision, Conveyance, and Project predevelopment costs, and (2) misusing Company funds earmarked for the 2015 renovation; creating the need for a capital call and noticing that call to recoup the misused funds; and falsely representing to

---

[37] *See generally* Compl.

[38] *Id.* ¶ 54.

16

Plaintiff that Company funds expended in connection with the Project's predevelopment would be reimbursed to the Company. And Count VI asserts that Manager and Charles breached the Operating Agreement by failing to provide monthly financial information.

On May 8, Defendants moved to dismiss (the "Motion").[39] The parties briefed the Motion as of July 2.[40] I held argument on August 19.[41] I asked whether the plenary action should be stayed pending resolution of the related Books and Records Action.[42] In response, the parties agreed to pursue voluntary mediation in the Delaware Court of Chancery pursuant to Rule 174, in lieu of proceeding with argument on the Motion.[43] Accordingly, I stayed both this action and the Books and Records Action and tabled the Motion.[44]

The parties mediated before a Court of Chancery judicial officer, but were unsuccessful.[45] I held a status conference on January 15, 2021, to inquire as to whether Plaintiff intended to pursue the still-pending Books and Records Action

---

[39] D.I. 16.

[40] *See id.*; D.I. 21; D.I. 25.

[41] *See* D.I. 31.

[42] *See id.*

[43] *See id.*

[44] *See id.*; D.I. 33.

[45] *See* D.I. 34.

before proceeding on the merits.[46] Plaintiff elected to voluntarily dismiss the Books and Records Action and pursue this plenary action.[47] I entered an order dismissing the Books and Records Action on January 21, and this action proceeded.[48] The Motion was therefore revived; because the parties did not reach argument on the merits at the August 2020 hearing, I held argument on the Motion on March 11, 2021 and took the Motion under advisement.[49]

## II. ANALYSIS

The Motion turns on Plaintiff's overarching theory of the case, which I view through the lens of Court of Chancery Rule 12(b)(6). The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[50]

---

[46] *See* BR D.I. 16; BR D.I. 19.

[47] *See* BR D.I. 17.

[48] *See* BR D.I. 18.

[49] *See* D.I. 37; D.I. 38.

[50] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

18

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[51] This standard is "minimal"[52] and plaintiff-friendly.[53] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[54] Despite this forgiving standard, the Court need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the nonmoving party.[55] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[56]

Defendants argue Plaintiff's claims are time-barred by laches and the analogous statute of limitations. And Defendants contend Plaintiff's claim for breach of fiduciary duty fails because the challenged transactions were approved pursuant to the Operating Agreement. As to Plaintiff's aiding and abetting claim, Defendants press that Charles, as Manager's agent, cannot be liable for aiding and abetting the entity's alleged breach. Defendants further contend Plaintiff has failed

---

[51] *Cent. Mortg. Co.*, 27 A.3d at 537.

[52] *Id.* at 536.

[53] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

[54] *Cent. Mortg. Co.*, 27 A.3d at 536.

[55] *See, e.g.*, *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[56] *Trados Inc.*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

19

to state a claim for breach of the Operating Agreement, as Plaintiff has not demonstrated a need for the routine provision of financial information under Section 10.4 and has abandoned the Books and Records Action. Finally, Defendants argue that Plaintiff has failed to plead a fraud claim with the requisite particularity, specifically failing to plead reliance.

In view of these arguments, I conclude that the Motion must be granted and denied in part. Count I for breach of fiduciary duty survives, but is dismissed to the extent it is duplicative of Count IV for breach of contract. Counts III and IV likewise overcome the Motion. And Count II for fraud is dismissed in its entirety, as Plaintiff's conclusory allegations fail to carry the claim past the pleading stage.

## A.  Plaintiff's Breach Of Fiduciary Duty Claim Is Not Time-Barred.

Defendants contend Count I's breach of fiduciary duty claim is time-barred to the extent it relies on paying predevelopment expenses using Company funds, as that cause of action accrued between January and August 2016 when Plaintiff learned Company funds would be used for predevelopment expenses and when those expenses were paid.[57] Plaintiff argues Defendants misstate the theory of breach with

---

[57] Defendants argue that "the Court should dismiss all of Plaintiff's claims involving the predevelopment expenses on the Adjacent Land, because those claims arose sometime between January and August of 2016 and, thus, are barred by the statute of limitations as applied through the doctrine of laches." D.I. 16 at 3. But Defendants only briefed that statute of limitations issue with respect to Count I. *See id.* at 18–23. Therefore, I only consider Defendants' statute of limitations argument with respect to the breach of fiduciary duty claim, even though Count II also invokes the predevelopment expenses.

respect to the predevelopment expenses and that its claims are not barred. In view of the allegations, I agree with Plaintiff.

The equitable doctrine of laches "prevent someone who slumbers on her rights and delays unreasonably in filing suit from being permitted to prosecute her claims."[58] While laches is a standalone doctrine, "[e]quity follows the law and in appropriate circumstances will apply a statute of limitations by analogy."[59] "[F]iling after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches."[60] For cases in equity alleging breach of fiduciary duty, fraud, or breach of contract, like this one, Delaware courts have looked to the analogous three-year statute of limitations period established by 10 *Del. C.* § 8106.[61] Thus, "[u]nless timely filing is excused by a recognized tolling doctrine, a plaintiff must file a claim for breach of fiduciary duty within three years of the conduct that gives rise to the claim."[62] "The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has

---

[58] *E.g.*, *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015).

[59] *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007).

[60] *E.g.*, *Levey v. Brownstone Asset Mgmt.*, *LP*, 76 A.3d 764, 769 (Del. 2013).

[61] *See, e.g.*, *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *15–16 (Del. Ch. Dec. 1, 2009).

[62] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013).

been a harmful act by a defendant.  This is true even if the plaintiff is unaware of the cause of action or the harm."[63]

"Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches."[64]  "The Delaware courts recognize three doctrines that may toll the statute of limitations:  (1) inherently unknowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties."[65]

Whether the analogous statute of limitations bars a plaintiff's claims "is properly raised on a motion to dismiss."[66]  At this stage, the Court conducts a three-part analysis to determine whether a claim is time-barred.

---

[63] *Tyson Foods, Inc.*, 919 A.2d at 584.

[64] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009).

[65] *Vichi*, 2009 WL 4345724, at *17.

[66] *Tyson Foods, Inc.*, 919 A.2d at 584; *see also Vichi*, 2009 WL 4345724, at *15.  However, "[t]he defense of laches is 'not ordinarily well-suited' for treatment on a Rule 12(b)(6) motion."  *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *10 (Del. Ch. June 23, 2015) (quoting *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009)).  Thus, "[u]nless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate."  *Reid*, 970 A.2d at 183–84.

From the pleadings, the Court determines (1) the date of accrual of the cause of action based on the allegations, (2) if the plaintiff has pleaded facts sufficient to create a reasonable inference that the statute of limitations has been tolled, and (3) assuming a tolling exception has been pleaded adequately, when the plaintiff was on inquiry notice of a claim based on the allegations.[67]

Defendants' argument fails under this analysis.

### 1. As Alleged, Plaintiff's Breach Of Fiduciary Duty Claim Did Not Accrue Until 2017, When Charles Refused To Reimburse The Company For Predevelopment Expenses.

Defendants' statute of limitations theory assumes that the underlying breach is the mere expenditure of Company funds for the Project's predevelopment, which Charles disclosed in his initial Project proposal and Plaintiff knew about by early to mid-2016.[68] This theory miscasts and oversimplifies Plaintiff's allegations and breach theory. Drawing all inferences in Plaintiff's favor, any cause of action based on the predevelopment expenses did not accrue until 2017, when Plaintiff learned via the Payoff Letter that the Company would not be reimbursed those funds.

With respect to the predevelopment expenses, Count I alleges that Manager, by and through Charles, breached its fiduciary duties by "expend[ing] funds in connection with the pre-development of the Adjacent [Land] *without*

---

[67] *Vichi*, 2009 WL 4345724, at *15 (quoting *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *14 (Del. Ch. Dec. 23, 2008)).

[68] *See* D.I. 16 at 20–23 (citing Compl. ¶¶ 9, 12–16 & Defs.' Ex. B).

*reimbursement*"; "allow[ing] Charles to perpetuate his fraudulent scheme to use Company funds in connection with the pre-development of the Adjacent Land and *then convey such land to the Majority Members for no consideration*"; and "fraudulently deposit[ing] funds into the Company's membership accounts *to then later be used in connection with the pre-development of the Adjacent [Land], creating the need for a capital call*."[69]

Plaintiff's claims with respect to reimbursement of the predevelopment expenses did not accrue until March 2017 when Charles shirked reimbursement; Plaintiff's claims with respect to the source of the predevelopment funds did not accrue until July 2017 when Charles issued the capital call. In 2016, Charles represented that Company funds would be used for predevelopment and then reimbursed. In his initial January 18, 2016 proposal, Charles "indicated that funds from the DoubleTree Hotel—*e.g.*, the Company's funds—would be allocated for predevelopment costs associated with the [Project]."[70] Thereafter, Charles represented to Plaintiff on multiple occasions, or at a minimum did not correct Plaintiff's belief, that the Company would be reimbursed. For example, at the January 24, 2017 hotel conference, Charles again represented to Plaintiff that the

---

[69] Compl. ¶ 54 (emphasis added).

[70] *Id.* ¶ 9.

Adjacent Land had no value and that the Company would be reimbursed for the predevelopment costs.

Then, on March 12, 2017, Plaintiff received the Payoff Letter, which indicated the Company would not be reimbursed the predevelopment funds, contrary to Charles's previous promises. Rather, Plaintiff's share of the predevelopment costs would be reimbursed only as a payoff because Plaintiff declined to invest in 9103 LLC. In July 2017, Plaintiff received the capital call notice and learned that Charles applied funds that were earmarked for a Company 2015 renovation to the Project's predevelopment costs.

Because Plaintiff sued in February 2020, within the analogous three-year limitations window, Count I's predevelopment cost claims are timely.

> **2. Even Assuming The Cause Of Action Accrued In 2016, Plaintiff Has Pled Facts Triggering The Tolling Doctrines And Indicating That Plaintiff Was On Inquiry Notice Of Claims Regarding The Predevelopment Expenses By March Or July 2017.**

Even assuming Defendants are correct that the cause of action accrued in early to mid-2016, Plaintiff has pled facts sufficient to implicate equitable tolling. The Court "does not strictly apply statutes of limitations," and recognizes that "the limitations period can be tolled in certain limited circumstances."[71] Under all three

---

[71] *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008) (quoting *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *6 (Del. Ch. Oct. 19, 2006)).

recognized tolling doctrines, the statute begins to run "upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[72] Inquiry notice does not require that the plaintiff have actual knowledge of the wrong, but merely an objective awareness of the facts giving rise to the wrong.[73]

> [A] plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice. That is to say, no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong. Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.[74]

Here, Plaintiff's allegations support application of the equitable tolling doctrine at this stage.

Manager is a fiduciary whose misconduct, via Charles, may be subject to equitable tolling. "The doctrine of equitable tolling suspends the statute of limitations for the duration of a plaintiff's reasonable reliance upon the competence and good faith of a fiduciary."[75] "No evidence of actual concealment is necessary

---

[72] *Vichi*, 2009 WL 4345724, at *17 (quoting *Wal-Mart Stores, Inc.*, 860 A.2d at 319).

[73] *Id.*

[74] *Tyson Foods, Inc.*, 919 A.2d at 585 (footnote omitted).

[75] *Seiden v. Kaneko*, 2015 WL 7289338, at *8 (Del. Ch. Nov. 3, 2015) (internal quotation marks omitted) (quoting *Tyson Foods, Inc.*, 919 A.2d at 585).

in such a case, but the statute is only tolled until the investor knew or had reason to know of the facts constituting the wrong."[76] And "[c]ertainly at this stage of the litigation, plaintiffs are entitled to the reasonable inference of conduct inconsistent with a fiduciary duty."[77]

In this case, Plaintiff was entitled to rely upon the competence and good faith of those protecting its interests, namely the Company's Manager. Equitable tolling would preserve Plaintiff's claims regarding the source and reimbursement of the predevelopment expenses. Plaintiff operated under the assumption that the Adjacent Land would be attributed its fair value when conveyed to the new entity as contemplated by Charles's Project proposal, and did not learn that Charles assessed it as valueless until shortly before January 24, 2017. Until Plaintiff received the March 12, 2017 Payoff Letter, Plaintiff reasonably relied on Charles's repeated representations that the Company would be reimbursed for its predevelopment expenditures. Only through the Payoff Letter did Plaintiff learn that Charles had no intention to reimburse the Company for the predevelopment costs. And Plaintiff did not discover the full extent of Charles's self-dealing with respect to the predevelopment costs until July 24, 2017, when Plaintiff received notice of the

---

[76] *Tyson Foods, Inc.*, 919 A.2d at 585 (internal quotation marks omitted) (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998)).

[77] *Id.* at 591.

capital call to pay for the 2015 DoubleTree renovation. At that point, Plaintiff learned that Manager, through Charles, spent Company funds on the Project rather than allocating those escrowed funds for the Company's renovation as planned. Charles's correspondence put Plaintiff on inquiry notice of its claims, and Plaintiff brought them timely.

* * * * *

Accepting the Complaint's allegations as true, Plaintiff's claims were timely brought or equitably tolled, at least for purposes of a motion to dismiss.[78] At trial, Defendants will have the opportunity to present evidence to demonstrate that no tolling doctrine applies or that Plaintiff was on inquiry notice of its claims with respect to the predevelopment expenses before March 2017.[79] But I may not infer such knowledge at this point in the proceedings. Accordingly, the laches doctrine and analogous three-year statute of limitations do not bar Count I at the pleading stage.

**B.     With One Exception, Plaintiff Has Stated A Claim For Breach Of Fiduciary Duty Against Charles And Manager.**

Having determined that Count I is not time-barred, I now turn to its sufficiency in view of Rule 12(b)(6). It is well-settled that "[a] claim for breach of fiduciary

---

[78] *See id.* at 590–91.

[79] *See id.* at 591.

28

duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[80] Plaintiff contends that Manager and Charles each owed fiduciary duties to the Company and its Members, and that they breached those duties by misdirecting Company funds toward the Project's predevelopment; valuing the Adjacent Land at zero, due in part to Charles's self-interested budget overruns; using that valuation to justify conveying the Adjacent Land to an entity Charles owned and controlled for no consideration; and issuing a capital call to rebalance the Company's ledgers in view of the overall scheme, which enriched Charles and his entities at Plaintiff's expense. Plaintiff also alleges Defendants breached their fiduciary duties by failing to provide financial information as required under the Operating Agreement. In response, Defendant contends that certain of the aforementioned actions are permitted under the Operating Agreement and that Plaintiff has failed to allege that the remainder were motivated by self-interest.

"[T]o have any fiduciary duties to an entity, the affiliate must exert control over the assets of that entity."[81] In keeping with that principle, Delaware law presumes that managers of limited liability companies owe fiduciary duties unless

---

[80] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[81] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009).

explicitly disclaimed.[82] Given the primacy of freedom of contract, Delaware's

limited liability company jurisprudence begins with the basic premise that, unless

limited by the operating agreement, the manager has a fiduciary duty to manage the

entity in its interest and in the interests of its members.[83] "Without language in an

[operating] agreement to the contrary, the managers of a Delaware LLC owe

traditional fiduciary duties of care and loyalty."[84]

Such agreements can disclaim fiduciary duties, but drafters "must do so

clearly, and should not be incentivized to obfuscate or surprise investors by

ambiguously stripping away the protections investors would ordinarily receive."[85]

"[I]f the parties have not unambiguously disavowed common law fiduciary duties, I

---

[82] *See, e.g.*, *Triple H Fam. Ltd. P'ship v. Neal*, 2018 WL 3650242, at *18 (Del. Ch. July 31, 2018) (stating that the traditional duties of loyalty and care are owed by managers of Delaware LLCs).

[83] *See* 6 *Del. C.* § 18-1101(b) (adopting the policy "to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements"); *In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract, and the parties have wide contractual freedom to structure the company as they see fit."); *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 322 (Del. Ch. 1998) (acknowledging the primacy of freedom of contract); *77 Charters, Inc. v. Gould*, 2020 WL 2520272, at *10 (Del. Ch. May 18, 2020) (stating "Delaware law recognizes the primacy of contract when addressing governance issues in the alternative entity space").

[84] *77 Charters, Inc.*, 2020 WL 2520272, at *9; *see also CSH Theatres, L.L.C. v. Nederlander of S.F. Assocs.*, 2018 WL 3646817, at *27 (Del. Ch. July 31, 2018), *aff'd in part, rev'd in part on other grounds sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019).

[85] *77 Charters, Inc.*, 2020 WL 2520272, at *8–9 (internal quotation marks omitted) (quoting *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014)).

must look to corporate law principles by analogy when determining whether and to what extent fiduciary duties are owed."[86]  But "[p]rinciples of contract preempt fiduciary principles where the parties to a limited [liability company] have made their intentions to do so plain,"[87] and "[the Company] may not saddle Defendants with common law fiduciary duties if doing so would contradict the plain language of the relevant LLC agreement."[88]

Regarding Manager's fiduciary duties, Section 5.6 of the Operating Agreement provides:

> The Manager shall manage the affairs of the Company to the best of its ability, shall use its good faith efforts to carry out the purpose of the Company, and shall devote to the Company such time and effort as may be necessary for the proper performance of its duties and the business of the Company.  The Manager shall have a fiduciary responsibility to the Members hereof.[89]

---

[86] *Id.* at *10.

[87] *Sonet*, 722 A.2d at 322; *see also Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006) ("Delaware's Limited Liability Company and Limited Partnership Acts[] permit the contracting parties to expand or restrict . . . fiduciary duties . . . . As a result, in the alternative entity context, it is frequently impossible to decide fiduciary duty claims without close examination of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship." (footnote and internal quotation marks omitted) (quoting 6 *Del. C.* § 18-1101(c)(2))); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153 (Del. Ch. 2004) ("In addition to any contractual duties owed by Fidelity Brazil and its managers, the managers owed a fiduciary duty of loyalty and care to Fidelity Brazil.").

[88] *77 Charters, Inc.*, 2020 WL 2520272, at *10 (citing *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) ("When . . . parties . . . cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default.")).

[89] Op. Agr. § 5.6.

31

Section 5.6 does not unambiguously disavow default fiduciary duties and acknowledges that Manager shall have fiduciary obligations to the Company's Members, so Manager owes default fiduciary duties to the extent they are not supplanted by the Operating Agreement's specific terms.[90] At a minimum, Manager owes the default duties of loyalty and care.[91]

Plaintiff primarily alleges Defendants breached their duty of loyalty. In the limited liability context, as in the corporate context, the duty of loyalty mandates that the best interest of the company and its stakeholders take precedence over any interest possessed by the manager and not shared by the stakeholders generally.[92] A manager is "not permitted to use their position of trust and confidence to further their private interests. Nor can fiduciaries intentionally act with a purpose other than that of advancing the best interests of the corporation."[93] "Specifically, and very pertinently to this case, such fiduciary duties include the duty not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of

---

[90] *See 77 Charters, Inc.*, 2020 WL 2520272, at *10; *Related Westpac LLC*, 2010 WL 2929708, at *8; *Sonet*, 722 A.2d at 322.

[91] *See, e.g.*, *Mehra v. Teller*, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) ("By default, limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation." (citing 6 *Del. C.* § 18-1104)).

[92] *See, e.g.*, *CSH Theatres, L.L.C.*, 2018 WL 3646817, at *27.

[93] *Id.* (alteration and internal quotation marks omitted) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939), and then quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

the minority stockholders."[94]  And "a fiduciary may not play 'hardball' with those to whom he owes fiduciary duties."[95]

Turning to Charles, the parties here agree the duty of loyalty extends to him personally under *In re USACafes, L.P. Litigation*, which held that the duty of loyalty may extend to the individuals and entities that control a managing entity if such persons exercise control over the entity's property.[96]  Plaintiff concedes Count I

---

[94] *Kelly v Blum*, 2010 WL 629850, at *12 (Del. Ch. Feb. 24, 2010) (internal quotation marks omitted) (quoting *Gentile v. Rossette*, 906 A.2d 91, 103 (Del. 2006)).

[95] *CSH Theatres, L.L.C.*, 2018 WL 3646817, at *27 (quoting *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 870 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012)).

[96] *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48–49 (Del. Ch. 1991); *see also Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *18–19 (Del. Ch. July 31, 2020); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 670–72 (Del. Ch. 2012).  Chancellor Allen developed this rule by looking to fundamental principles of equity, stating that "the principle of fiduciary duty, stated most generally," is that "one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."  *USACafes*, 600 A.2d at 48.  Nonetheless, Chancellor Allen recognized that, subject to contextual caveats, "the same result might be rationalized as aider and abettor liability."  *Id.* at 49.  He also left as an open question "the full scope of that duty."  *Id.*  This Court has cabined the *USACafes* fiduciary obligation to the duty of loyalty.  *See 77 Charters, Inc.*, 2020 WL 2520272, at *9 ("*USACafes* recognizes remote controllers (such as Gould) will owe *limited* fiduciary duties . . . ."); *Feeley*, 62 A.3d at 671 (holding *USACafes* duties do not include the duty of care and have only been extended to "classic self-dealing" transactions); *Bay Ctr.*, 2009 WL 1124451, at *10 ("In practice, the cases applying *USACafes* have not ventured beyond the clear application stated in *USACafes:* the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership." (internal quotation marks omitted)); Martin I. Lubaroff *et al*., *Lubaroff & Altman on Delaware Limited Partnerships* § 14.01[C], at 14-19 (2d ed. 2020) ("*USACafes, L.P.* does not fully define the scope of a common law fiduciary duty of a director of a corporate general partner to a limited partnership and to its limited partners.").

33

cannot survive against Charles for any breach of the duty of care. [97] So circumscribed, "Charles, as Manager's managing member, and by reason of the fact that Charles controls all the Company's operations and activities, owes fiduciary duties to Plaintiff."[98]

"To plead a claim for breach of the duty of loyalty that will overcome a motion to dismiss, a plaintiff must plead sufficient facts to support a rational inference that the [] fiduciary acted out of material self-interest that diverged from the interests of the [Company or its members]."[99] Plaintiff alleges Defendants breached their duties of loyalty by causing the Company to (i) expend funds in connection with the predevelopment of the Adjacent Land without reimbursement; (ii) subdivide and convey the Adjacent Land to an entity owned and controlled by the Majority Members for no consideration; (iii) fail to adhere to its contractual obligations to distribute monthly financial information in accordance with the Operating Agreement; (iv) allow Charles to perpetuate his fraudulent scheme to use Company funds in connection with the predevelopment of the Adjacent Land and then convey such land to the Majority Members for no consideration; (v) fraudulently deposit funds into the Company's membership accounts to be used in connection with the

---

[97] *See* D.I. 21 at 32 n.10.

[98] Compl. ¶ 53.

[99] *E.g.*, *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *21 (Del. Ch. Apr. 11, 2017).

predevelopment of the Adjacent Land, creating the need for a capital call; and (vi) make that capital call. Accepting the Complaint's allegations as true and drawing all reasonable inferences in Plaintiff's favor, I conclude that Plaintiff has stated a claim based on an overarching theory of misconduct aimed at depriving Plaintiff of information and fair value.

The Complaint describes an orchestrated series of self-interested actions by Charles and Manager, taken to the detriment of the Company and Plaintiff. Charles and his entity 9103 LLC would receive financial gain from the Project, paid for by the Company and its Members; Charles and his entity, Frontier Development, would receive a developer fee from erecting the Project; and Charles would collect a continual asset management fee from managing the Project upon its completion. He was therefore incentivized to push the Project, and to "contrive a means to complete the project and convey the Adjacent Land without expending any additional resources."[100]

In particular, the Complaint alleges that Defendants caused the Company to expend approximately $700,000 in Company funds for the predevelopment of the Adjacent Land before the Conveyance. Those funds were available because Defendants had deposited certain funds, intended to pay for a 2015 renovation project, into the Company's membership accounts. Defendants then used those

---

[100] Compl. ¶ 29.

misdirected funds to pursue the Project and secure Charles unique benefits that were not shared with the Company and its Members. Plaintiff has alleged Defendants did so on the cheap by ignoring the Adjacent Land's actual value (in which Plaintiff had a legitimate interest) and failing to reimburse the Company for the predevelopment expenses.

Instead of reimbursing the Company $700,000 for the Project's predevelopment costs, conveying the Adjacent Land to 9103 LLC for fair consideration, and allotting to Plaintiff its rightful share from the Company's returns from both transactions, Charles offered Plaintiff $105,000, or Plaintiff's share of the predevelopment costs, but did not offer anything to account for value in the conveyed Adjacent Land. To support his self-dealing, Charles repeatedly fell back on his conclusion that the Adjacent Land was valueless.

At bottom, Plaintiff alleges that Defendants took two sources of Company assets in which Plaintiff had a stake (the Adjacent Land and the $700,000 of Company funds), and moved them over to a new entity that Charles owned and controlled. Charles used Company funds earmarked for the 2015 Company renovation to pay for his self-serving overruns on the Adjacent Land's predevelopment costs, and compensated for those overruns by assigning the Adjacent Land zero value. By alleging that Charles paid himself and his entities,

36

rather than retaining value for the Company and its Members, Plaintiff states a claim for breach of fiduciary duty.

Defendants push back on Plaintiff's theory of breach, taking a more segmented view of the Complaint's allegations. Specifically, Defendants argue that their actions, including the Conveyance, Subdivision, and business dealings between the Company and Charles, are permitted under the Operating Agreement's specific provisions. Defendants point to Sections 5.2(16) and 5.4, which allow 70% of the Membership Interests to authorize a transaction with Manager and its affiliates; Section 5.2(20), which authorizes Manager to subdivide the Adjacent Land; and Section 5.2(27), which allows 70% of the Membership Interests to authorize a conveyance of the Adjacent Land. According to Defendants, Manager received the requisite 70% Member approval before proceeding with each step in the challenged transaction, so those approved steps cannot contribute to a breach of fiduciary duty.

Defendants are correct that "one needs to read the Agreement as a whole, and not just concentrate on one provision that mentions one of the 'magic words.'"[101]

---

[101] *Sonet*, 722 A.2d at 324; *see also R.S.M. Inc. v. All. Cap. Mgmt. Hldgs. L.P.*, 790 A.2d 478, 497–98 (Del. Ch. 2001) ("[W]here the use of default fiduciary duties would intrude upon the contractual rights or expectations of the general partner or be insensible in view of the contractual mechanisms governing the transaction under consideration, the court will eschew fiduciary concepts and focus on a purely contractual analysis of the dispute. Put somewhat differently, the irreconcilability of fiduciary duty principles with the operation of the partnership agreement can itself be evidence of the clear intention of the parties to preempt fiduciary principles." (footnote omitted)).

When parties "cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default." [102]   Thus, "[w]hen a fiduciary duty claim is *plainly inconsistent* with the contractual bargain struck by parties to an LLC or other alternative entity agreement, the fiduciary duty claim must fall, otherwise the primacy of contract law over fiduciary law in matters involving contractual rights and obligations would be undermined."[103]

Here, Plaintiff's theory of breach is not "plainly inconsistent" with the Operating Agreement provisions Defendants invoke.   Although the Majority Members may have authorized the Subdivision and Conveyance under the Operating Agreement, that authorization does not preclude Plaintiff's broader claims.  Plaintiff generally alleges that Defendants "caus[ed] the Company" to pursue each of the events giving rise to Plaintiff's breach theory.[104]  More specifically, Plaintiff alleges that the Majority Members "act[ed] at the direction of Charles" when they approved the Subdivision and Conveyance.[105]

---

[102] *Related Westpac LLC*, 2010 WL 2929708, at *8.

[103] *Id.* (emphasis added) (alterations and internal quotation marks omitted) (quoting *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001)).

[104] Compl. ¶ 54.

[105] *Id.* ¶¶ 21, 22.

And more fundamentally, the Majority Members' approval does not preclude a breach of fiduciary duty claim because of the breadth of Plaintiff's theory, and because of the breadth of Defendants' duties.[106] As the Delaware Supreme Court famously recognized in *Schnell v. Chris-Craft Industries, Inc.*, "inequitable action does not become permissible simply because it is legally possible."[107] Here, while Defendants press that their conduct cannot be challenged because they technically complied with Section 5.2, that does not mean that their default fiduciary duties drop out as a check on their conduct.[108] Plaintiff's issues with the Subdivision and Conveyance are not the acts themselves, but their attendant circumstances: the Adjacent Land was subdivided so that it could be conveyed "to an entity owned and

---

[106] *See Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971); *see also DG BF, LLC v. Ray*, 2021 WL 776742, at *25 (Del. Ch. Mar. 1, 2021) (relying on *Schnell*, 285 A.2d at 439, and holding that "technical compliance with the Operating Agreement's removal procedures d[id] not foreclose Plaintiffs' claim" that the manager was wrongfully removed); *Solar Cells, Inc. v. True N. P'rs, LLC*, 2002 WL 749163, at *4 (Del. Ch. Apr. 25, 2002) ("Even if waiver of liability for engaging in conflicting interest transactions is contracted for, that does not mean that there is a waiver of all fiduciary duties to Solar Cells. Indeed, § 4.18(a) expressly states that the True North Managers must act in 'good faith.' . . . Th[e challenged] actions do not appear to be those of fiduciaries acting in good faith. As the Supreme Court and this Court have made clear, it is not an unassailable defense to say that what was done was in technical compliance with the law." (citing *Schnell*, 285 A.2d at 437)); *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) ("Corporate acts thus must be 'twice-tested'—once by the law and again by equity."); Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 9.04[B][3], at 9-47 n.229 & § 10.04[D][1], at 14-28 n.182 (2d ed. 2019) (citing *Schnell* and noting that "[t]he tenent that action legally taken remains subject to equitable considerations is a pervasive and powerful principle under Delaware law").

[107] 285 A.2d at 439.

[108] *See DG BF, LLC*, 2021 WL 776742, at *25; *Solar Cells, Inc.*, 2002 WL 749163, at *4.

controlled by the Majority Members *for no consideration*."[109] Sections 5.2 and 5.4 of the Operating Agreement do not expressly govern circumstances in which the Majority Members are alleged to have approved actions at Manager's direction, rather than their own volition, and for no consideration. As alleged, Plaintiff's theory exceeds the Operating Agreement's specific approval procedures in Sections 5.2 and 5.4 and enters the area in which the default duties memorialized in Section 5.6 are intended to operate. In that context, Plaintiff has alleged Defendants breached their duty of loyalty by pursuing a series of actions to Charles's benefit, and mishandling Company assets along the way.

Holding Defendants to equitable standards and their fiduciary duties regardless of technical approvals is also required by the Operating Agreement. Section 5.2's procedural safeguards for particular transactions do not obviate Manager's fiduciary duties in performing those transactions. *Ross Holding & Management Co. v. Advance Realty Group, LLC* is instructive.[110] There, the defendants argued that a provision mandating that the "Managing Board shall act reasonably and in good faith in its management of the Company" provided a standard of conduct that supplanted default duties,[111] and that a majority vote provision acted

---

[109] *E.g.*, Compl. ¶ 54 (emphasis added).

[110] 2014 WL 4374261 (Del. Ch. Sept. 4, 2014).

[111] *Id.* at *13.

as a "safe harbor from judicial review for certain acts which might otherwise violate the traditional duty of loyalty."[112]  *Ross* rejected both positions, as Delaware law requires that "fiduciary duties, if they are to be disclaimed, must be disclaimed in the operating agreement."[113]  "[A]greements' drafters must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive."[114]  Even if a provision sets procedural conditions for managerial action, in the absence of such an express disclaimer, "the drafters may not have intended to modify in any way the [manager's] ability to engage in conflicted transactions."[115]  Said another way, the inclusion of certain procedural checks "does not necessarily imply a reciprocal understanding that all other duties, which traditionally apply, are being disclaimed."[116]  Thus "[a] failure to mention a duty or to contemplate a given conflicted transaction is not an adequate disclaimer of it.  Such a rule, which resolves ambiguities in favor of the full panoply of duties, is sensible."[117]

---

[112] *Id.* at *14.

[113] *Id.* at *15.

[114] *Id.* (citing *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *10 (Del. Ch. Oct. 28, 2010) ("[P]arties to a limited liability company agreement bear the risk that they have drafted it incompletely.")).

[115] *Id.* at *14.

[116] *Id.*

[117] *Id.* at *15.

The Operating Agreement does not alter Manager's default duties with a specified managerial standard of conduct. As in *Ross*, Sections 5.2 and 5.4 do not clearly eliminate or modify the traditional fiduciary duties. Nothing in those provisions explicitly supplants the traditional duty of loyalty and permits Manager's self-dealing without the risk of liability.[118] It is not plain from the Operating Agreement that the parties intended the 70% Membership approval safeguard to operate as a standard-of-conduct check on Manager, displacing Section 5.6's fiduciary duty mandate as that check.[119] Rather, "the plain import of the[se] section[s] is to specify certain special circumstances in which the parties agreed that

---

[118] *See id.* at \*14; *see* Op. Agr. §§ 5.2(16) (providing that Manager may not "approve transactions with Affiliates of the Manager, except as provided in Section 5.4 of this Agreement" unless it receives consent of 70% of the Membership Interests), 5.4(a) ("No Manager or Affiliate thereof shall receive any salary or other direct or indirect compensation for any services or goods provided in connection with the Company except as expressly provided herein, or as to which the Consent of holders of seventy percent (70%) of the Interests in the Company has been obtained to the precise terms thereof. Any such salary or other compensation shall be comparable to what would be paid to an independent third party in an arms' length transaction, unless the Consent of holders of seventy percent (70%) of the Interests in the Company is specifically obtained to the particular salary or compensation.").

[119] *Compare* Op. Agr. § 5.2, *with Sonet*, 722 A.2d at 324 (clearly adopting in the company's operating agreement contractual standards of conduct applicable to the manager and adding as an additional check on that conduct the mandate that certain transactions be approved by a supermajority vote). For example, Section 5.2 was not drafted using terms that traditionally indicate a contractual standard of conduct that trumps default duties, stating only that the Manager "shall not do any of the following acts without in each and every instance the Consent of holders of 70%" of the Company's Membership Interests. Op. Agr. § 5.2; *compare id.*, *with CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at \*18 (Del. Ch. Jan. 31, 2017) (construing a provision to offer a safe harbor for conflicted transactions displacing the default duty of loyalty).

additional approvals would be necessary."[120] They do not "grant[] a broad right and explain[] that if certain procedures were complied with the transaction could be immune from challenge."[121] In other words, nothing in the Operating Agreement explicitly absolved Manager of any fiduciary breach simply because it received 70% Membership approval under Section 5.2. Section 5.6 enshrines default fiduciary duties, and Sections 5.2 and 5.4 grant additional procedural protection without expressly modifying the applicable standard of conduct and without including "language immunizing these acts from challenges" based on default duties.[122] Defendants' interpretation therefore "overlooks our law's requirement that the drafters' intent to eliminate such duties be plain and unambiguous."[123] Consequently, the Motion is denied on those grounds.

However, to the extent Count I depends on Defendants' failure to provide financial information under the Operating Agreement, Count I must be dismissed as duplicative of Count IV. A contractual breach of a duty to disclose financial information does not constitute a breach of fiduciary duty, and a plaintiff must articulate why a breach of a contractual obligation amounts to a fiduciary breach and

---

[120] *Ross*, 2014 WL 4374261, at *14.

[121] *Id.* (citing *Zimmerman v. Crothall*, 62 A.3d 676, 702–03 (Del. Ch. 2013) (applying a provision that supplanted default standards of conduct)).

[122] *Id.*

[123] *Id.* at *13.

43

is not merely duplicative of a breach of contract claim.[124] "[T]o permit a fiduciary duty claim based entirely on a breach of contract to proceed alongside the primary contract claim would undermine the primacy of contract law over fiduciary law in matters involving contractual rights and obligations."[125] Accordingly, Plaintiff cannot replead Count IV as a breach of fiduciary duty claim without alleging additional or different facts to support Count I.[126] Plaintiff has not done so here, and so Count I is dismissed in part.

### C. Subject To Count I, Plaintiff Has Stated An Aiding And Abetting Claim Against Charles.

Plaintiff included a count for aiding and abetting against Charles, in the alternative, in the event that the Court should determine that Charles does not owe

---

[124] *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports. The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty. Thus, this factual allegation does not state a claim for breach of fiduciary duty." (footnotes omitted)); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *8 (Del. Ch. May 10, 2018) ("Delaware law is clear that fiduciary duty claims may not proceed in tandem with breach of contract claims absent an independent basis for the fiduciary duty claims apart from the contractual claims. This rule stems from the primacy of contract law over fiduciary law in this state." (internal quotation marks omitted) (quoting *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015), and then quoting *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *12 (Del. Ch. Aug. 30, 2013))).

[125] *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *18 (Del. Ch. Sept. 18, 2014) (alterations and internal quotation marks omitted) (quoting *Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998)).

[126] *See id.* at *19.

fiduciary duties to the Company in his role as the managing member of Manager.[127]

For an aiding and abetting claim to survive, a plaintiff must plead "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[128]

Although I have noted the undisputed premise that Charles owes a duty of loyalty under *USACafes*, Count III survives to the extent discovery reveals that Charles should not be deemed to owe fiduciary duties, or that Manager has breached its duty of care.

Defendants argue that Plaintiff's claim fails because Charles is the managing member of Manager, and Manager is alleged to have committed the breach of fiduciary duties. "[L]ike civil conspiracy, officers and agents cannot aid and abet their principal or each other in the commission of a tort."[129] But there is an exception

---

[127] *See* Compl. ¶ 64.

[128] *E.g.*, *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 175 (Del. 2002) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)).

[129] *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012); *see also Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011) ("To the extent Plaintiffs argue that a conspiracy existed between certain Individual Defendants and their respective corporate employers, *e.g.*, between Sauter and Vanguard, these claims are legally deficient because a corporation generally cannot be deemed to have conspired with its officers and agents for purposes of establishing jurisdiction under the conspiracy theory." (internal quotation marks omitted)), *aff'd*, 38 A.3d 1254 (Del. 2012); *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) (assessing the basic rule in the context of commonly-controlled entities; *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch.

45

to this rule where an agent steps out of his role as an officer or agent and acts pursuant to personal motives.[130]  This exception applies here at the pleading stage.  To the extent Charles does not himself owe fiduciary duties, Plaintiff has pled that he knowingly participated in those breaches, as Manager acted by and through Charles.[131]  Through Charles, Manager expended Company resources to develop a parcel of property, without the promised reimbursement to the Company, and subsequently gave valuable Company property to an entity Charles controlled for no consideration to the detriment of the Company and Plaintiff.  Plaintiff has pled facts that permit the Court to reasonably infer that Charles caused the Company to pursue

---

Feb. 28, 2006); *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005) ("It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.").

[130] *Amaysing Techs. Corp.*, 2005 WL 578972, at *7 ("An exception exists to this general rule, however, when the officer or agent of the corporation steps out of her role as an officer or agent and acts pursuant to personal motives.").

[131] *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 204 (Del. Ch. 2014) ("The Complaint adequately alleges that ASIA is controlled by EBF such that for pleading purposes, [] EBF's knowledge should be imputed to ASIA."); *Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006) (holding that plaintiff "satisf[ied] the knowing participation element of the claim because Hallinan's knowledge as a director and officer of both Main Street and TC is imputed to them" (footnote omitted)); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995) (stating that "[f]or the purpose of assessing this motion to dismiss, this court infers their 'knowing' participation from the factual allegations in the complaint as to the overarching control of Lewis over these entities," and that defendants' "receipt of improper benefits suffices to prove their participation in the alleged breaches of fiduciary duties").

the Project and self-interested transactions for personal gain. The Motion is denied as to Count III.

### D. Plaintiff Has Stated A Claim For Manager's Breach Of The Operating Agreement.

Count IV contends that Manager breached the Operating Agreement by failing to prepare and distribute monthly financial information as required under Section 10.4. "Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages."[132] Plaintiff has alleged sufficient facts to state a claim.

Section 10.4 of the Operating Agreement provides that the Manager "shall cause to be prepared and distributed" to each member monthly financial information as set forth in that section.[133] Plaintiff alleges that in July 2018, it requested that the Company provide the monthly financial reporting information required under the Operating Agreement. Plaintiff further alleges that "[a]t that point, regular communications and delivery of the required financial information abruptly ended."[134] Manager, via Charles, responded that the Company would be moving to

---

[132] *E.g.*, *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018).

[133] Op. Agr. § 10.4.

[134] Compl. ¶ 42.

producing financial information on a quarterly basis, rather than on a monthly basis as required by the Operating Agreement.[135] As a result of these actions, Plaintiff alleges it has been damaged in an amount to be proven at trial.[136] These allegations are sufficient to put Manager on notice of its breach of Section 10.4.

Nonetheless, Defendants push back, arguing Count IV should be dismissed because Plaintiff has failed to allege an injury.[137] In support, Defendants argue that Plaintiff has not alleged "what it could have seen from monthly financial statements that it did not have from the information it was provided."[138] Defendants also look to the Books and Records Action, claiming Plaintiff abandoned it and refused to inspect documents at the Manager's office, and therefore "admitted that it has all of the documents it needs to attempt to state a claim in the plenary action."[139] Defendants conclude Plaintiff's chosen course of conduct "shows that it has not been

---

[135] *Id.* ¶ 43.

[136] *Id.* ¶¶ 76, 77.

[137] *See McCoy v. Cox*, 2007 WL 1677536, at *5 (Del. Super. Ct. June 11, 2007) ("Even if the evidence established that the Coxes' breached the contract by failing to disclose this information (which it does not), McCoy's claims fail, because he did not prove by a preponderance of the evidence that he suffered any damages as a proximate result of this breach.").

[138] D.I. 16 at 51.

[139] *Id.* at 51–52.

damaged by any alleged failure of Manager and Charles to distribute financial information."[140]

Although I recognize Defendants' frustration with Plaintiff's choice to abandon the Books and Records Action, I must look to the Complaint's allegations and accept those as true at this stage. Defendants do not dispute that Section 10.4 of the Operating Agreement obliged Manager to provide monthly financial information to the members. The Operating Agreement does not condition the provision of this information upon a member demonstrating a need for the financial information. And whether Plaintiff received the information sought in the Books and Records Action has no bearing at the pleading stage on Plaintiff's right to receive the information under the Operating Agreement, nor on Manager's contractual obligation to provide the information.

Manager did not fulfill its obligation to provide that information, and Plaintiff proceeded in the dark and has alleged that, as a result, it was damaged in an amount to be proven at trial. The Motion is denied as to Count IV.

### E. Plaintiff Has Failed To State A Claim For Fraud.

Count II asserts fraud against Charles and Manager. Specifically, Plaintiff alleges that Defendants engaged in a scheme to defraud Plaintiff by (i) causing the Company to fail to distribute monthly financial information under the Operating

---

[140] *Id.* at 52.

Agreement, and thereby concealing from Plaintiff information necessary to understand the full extent of Defendants' wrongful conduct; (ii) failing to disclose all information related to the Subdivision and Conveyance to an entity owned and controlled by the Majority Members for no consideration, despite Plaintiff's repeated requests; (iii) depositing funds into the Company's membership accounts to later be used for the predevelopment of the Adjacent Land, creating the need for a capital call; (iv) making that capital call; and (v) falsely representing to Plaintiff that Company would be reimbursed for funds expended for predevelopment. While Plaintiff has demonstrated at the pleading stage that Defendants' conduct was not above-board, Plaintiff has failed plead fraud with the requisite particularity.

To state a claim for fraud, the facts pled must "support[] an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."[141] Under Court of Chancery Rule 9(b), the elements of a fraud claim must be pled with particularity, although "[m]alice, intent, knowledge and other condition

---

[141] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

of mind of a person may be averred generally."[142]  Thus, "[t]o satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[143]

Plaintiff hangs Count II on its own characterization of Defendants' actions as a fraudulent scheme.[144]  But "conclusory allegations of a 'scheme' are insufficient, and do not excuse the [p]laintiffs from their burden of properly stating a claim upon which relief may be granted."[145]  Plaintiff's fraud theory divines a plot among Manager, Charles, the general contractor, and other Members dating back to 2015 to intentionally not pay the general contractor hundreds of thousands of dollars it was owed for nearly two years; use Company funds for predevelopment efforts on the Adjacent Land; later "discover" the payment error and make a capital call; and transfer the Adjacent Land to a new entity for no consideration, all while hoping Plaintiff would not invest in 9103 LLC.  Plaintiff's "scheme" hangs on two unreasonable and insufficiently pled assumptions: that Defendants began the scheme with Galilee in 2015, and that Defendants somehow knew Plaintiff would not invest

---

[142] Ct. Ch. R. 9(b).

[143] *Abry P'rs*, 891 A.2d at 1050; *see also Metro Commc'n Corp. BVI*, 854 A.2d at 144.

[144] *See* D.I. 21 at 46–47.

[145] *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *15 (Del. Ch. Jan. 29, 2016).

in 9103 LLC. At this stage, in the absence of supporting particularized facts, it would be unreasonable to draw those inferences in Plaintiff's favor.

Further, under Rule 9(b), Plaintiff has not pled any specific misrepresentation or omission by Manager or Charles that was intended to prevent or induce action. Although Plaintiff's Complaint frequently uses the word "fraud" or "fraudulently," Plaintiff specifically alleges only that Charles told Prigmore on January 24, 2017, that "the Company would only be reimbursed for the predevelopment costs."[146] Plaintiff does not specify what action Defendants' statements were intended to induce, how they induced it, or why it was reasonable to rely on those statements. Nor does Plaintiff plead facts sufficient to satisfy the reliance element of the claim: Plaintiff fails to allege that it took any action in reliance on Charles's purported concealment of the source of the predevelopment funds; alleged promise that the Company would be reimbursed; alleged use of the capital call to recoup those funds; or the Subdivision and Conveyance. To the contrary, Plaintiff pleads that it rejected Charles's proposal to invest in the 9103 LLC and the Project as early as August 2016, well-before many of the actions and discoveries that allegedly constitute a fraud.[147] Accordingly, Count II is dismissed.

---

[146] *See* Compl. ¶ 23.

[147] *See id.* ¶¶ 16, 19.

### III.  CONCLUSION

The Motion is **GRANTED** in part and **DENIED** in part.  The parties shall submit an implementing order with twenty days of this decision.